UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| DAVID RONGE, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>CAMPING WORLD HOLDINGS, INC., MARCUS A. LEMONIS, THOMAS F. WOLFE, BRENT L. MOODY, STEPHEN ADAMS, CRESTVIEW PARTNERS II GP, L.P., CRESTVIEW ADVISORS, L.L.C., ANDRIS A. BALTINS, BRIAN P. CASSIDY, MARY J. GEORGE, DANIEL G. KILPATRICK, HOWARD A. KOSICK, JEFFREY A. MARCUS, K. DILLON SCHICKLI, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CREDIT SUISSE SECURITIES (USA) LLC, ROBERT W. BAIRD & CO. INCORPORATED, BMO CAPITAL MARKETS INC., KEYBANC CAPITAL MARKETS INC., STEPHENS INC. and WELLS FARGO SECURITIES, LLC, )<br><br>Defendants. ) | Case No. 1:18-cv-07030<br>**(Consolidated)**<br><br>CLASS ACTION<br><br>Judge Rebecca R. Pallmeyer<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE ACTION ...................................................................................1

JURISDICTION AND VENUE ...............................................................................5

EXCHANGE ACT CLAIMS ...................................................................................6

    Plaintiffs ...............................................................................................................6

    Defendants ...........................................................................................................7

EVENTS LEADING UP TO THE CLASS PERIOD ...............................................8

    Camping World Prior to the IPO .......................................................................8

    The Camping World IPO ..................................................................................11

    Camping World's Acquisition of Gander Stores .............................................12

DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS ...................13

    False and Misleading Statements Regarding Internal Controls and Financial Results ...............................................................................................................14

    False and Misleading Statements Regarding the Integration of Gander Stores ................19

DEFENDANTS' FAILURE TO DISCLOSE INFORMATION REQUIRED UNDER ITEM 303 OF REGULATION S-K ......................................................................29

SUBSEQUENT EVENTS ......................................................................................31

    Defendants Admit Material Weaknesses in Internal Controls and Misstated Earnings ............................................................................................................31

    Defendants Admit the Failures in the Gander Integration and Rollout ...........33

FORMER EMPLOYEE ACCOUNTS REGARDING GANDER ...........................36

    Selecting Poor Performing Gander Stores for Reopening ...............................36

    Technology Incompatibility and Inventory Disruptions ..................................39

    Problems at the Gander Distribution Center ....................................................41

    Delays in Gander Store Openings ....................................................................44

ADDITIONAL SCIENTER ALLEGATIONS ........................................................48

**Page**

Defendants Controlled the Company and Its Public Messaging ......................................48

Insiders Sold Camping World Stock at Inflated Prices ...................................................49

Defendants Conducted Due Diligence Prior to the Gander Acquisition and
Closely Monitored the Rollout.........................................................................................51

Defendants' Reckless Disregard for Internal Controls and Accurate Financial
Reporting...........................................................................................................................55

Lemonis' Admissions Regarding His Disclosure Failures ..............................................57

LOSS CAUSATION AND ECONOMIC LOSS ........................................................................58

PRESUMPTION OF RELIANCE ...............................................................................................62

NO SAFE HARBOR ....................................................................................................................64

COUNT I ........................................................................................................................................65

COUNT II .......................................................................................................................................66

NON-FRAUD SECURITIES ACT CLAIMS .............................................................................69

Background to the Securities Act Claims ........................................................................69

Securities Act Claims Defendants ...................................................................................70

The May 2017 Registration Statement Was False and Misleading .................................71

The October 2017 Registration Statement Was False and Misleading.............................74

The October 2017 Registration Statement Violated Item 303.........................................77

COUNT III.......................................................................................................................................79

COUNT IV.......................................................................................................................................80

COUNT V ........................................................................................................................................81

COUNT VI........................................................................................................................................82

COUNT VII .....................................................................................................................................84

CLASS ACTION ALLEGATIONS .............................................................................................85

1537028_1

**Page**

PRAYER FOR RELIEF ............................................................................................................87

JURY DEMAND ....................................................................................................................88

1537028_1

Plaintiffs, individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiffs' attorneys. This investigation included, among other things: review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Camping World Holdings, Inc. ("Camping World" or the "Company"), review and analysis of Company press releases and earnings call transcripts, review and analysis of information posted on the Company website, review and analysis of analyst reports and media reports about the Company and the industry, and interviews with former employees of Camping World. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.     This is a federal securities class action on behalf of all purchasers of Camping World Class A common stock during the period from March 8, 2017 through August 7, 2018, inclusive ("Class Period"), including those who purchased shares of Camping World Class A common stock in the Company's secondary public offerings, which occurred on or around May 26, 2017 ("May 2017 Offering") and October 27, 2017 ("October 2017 Offering"), and were damaged thereby (the "Class"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, and §§11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §77k, 77l(a)(2) and 77o.

2.     This case arises from an unfortunate – but not uncommon – securities fraud pattern wherein insiders boast of the great performance of a private company, take the company public to raise money from investors, and then admit, after the insiders have cashed out massive profits, that things are not nearly as good as investors were led to believe. Here, Camping World's stock was

- 1 -

issued at $22 per share, run up to over $40 a share as the insiders made significant stock sales, and then the truth was revealed, and the stock crashed and currently trades around $15 per share.

3.     Defendants took Camping World public as a means to cash out a portion of their massive holdings in Camping World.  The Company's initial public offering ("IPO") took place in October 2016, and thereafter defendants made a series of false and misleading statements that artificially inflated the price of Camping World Class A common stock.  Defendants made false and misleading statements regarding the Company's financial performance, the effectiveness of internal controls to ensure accurate financial reporting, and the success and profitability of the integration and rollout of Gander Mountain stores that the Company had recently acquired out of bankruptcy. Defendants then profited from the false and misleading statements by selling Camping World stock at inflated prices.

4.     Despite the overly rosy statements about Camping World's performance and the integration of Gander stores, less than two years after the IPO defendants admitted that the Company's publicly filed financial statements contained several errors due to numerous material weaknesses in its controls over financial reporting and that the rollout of Gander Mountain stores was, in the Chief Executive Officer's ("CEO") own words, a "giant sh** show" that was costing the Company tens of millions of dollars.  When these previously concealed facts were disclosed, Camping World's stock crashed and the Company's investors suffered hundreds of millions of dollars in losses.

5.     Camping World specializes in the selling of recreational vehicles ("RVs") and services related to RV ownership and maintenance.  In 2006, defendant Marcus Lemonis ("Lemonis") became President and CEO of Camping World.  Since then, Lemonis, along with defendant Stephen Adams ("Adams") and defendant private equity firm Crestview Partners II GP,

- 2 -

L.P. ("Crestview"), collected massive stakes in the Company, becoming its majority and controlling shareholders.

6.      Lemonis', Adams', and Crestview's ownership interests in Camping World were largely illiquid without access to the public markets, so they took the Company public. Although the IPO brought the Company into the public marketplace, Camping World remained structured as a functionally private corporation, with Lemonis and the other insiders retaining majority voting and decision-making power.

7.      Issuing stock, and raising money from the public, came with obligations. Camping World now had to publicly issue financial statements, and defendants had to truthfully answer questions from analysts and investors about the business. Defendant Lemonis admitted his dislike for the disclosure obligations of being a public company, saying at the end of the Class Period that he was "used to holding all my cards so I can sucker punch my competitor." This desire to keep information private led defendants to fraudulently conceal material negative information from the investing public.

8.      The Class Period starts on March 8, 2017, when defendants issued Camping World's financial statements for the year and quarter ended December 31, 2016. Unbeknownst to the Company's public investors, the financial statements concealed that the Company suffered numerous material weaknesses in its internal controls, reported basic earnings per share ("EPS") that were inflated by over 37%, and reported net income that was inflated by nearly 20%. Defendants continued to conceal this information during the Class Period by claiming the Company's internal controls were effective and repeating the overstated 2016 financial results.

9.      In addition, in May 2017, defendants announced that Camping World was expanding its business into outdoor retail sales. Specifically, defendants announced that the Company was the winning bidder to acquire the rights to Gander Mountain stores out of bankruptcy, which would be

- 3 -

rebranded as Gander Outdoors ("Gander").  To justify purchasing a chain of stores that had gone bankrupt, defendants claimed they would only "**open stores that have a historical level of profitability**" and that the acquisition would not hurt, but would maintain, profit margins. Defendants repeatedly touted the integration and rollout of stores, claiming that "**early trends in these stores have been very promising**," and that Camping World's systems allowed them to "**stock the right products at the necessary locations, all at the right time and in the correct quantity**."  In truth, defendants concealed material, negative facts from investors regarding the increased costs and technological incompatibility of integrating high volume, lower-value Gander items into Camping World's inventory and distribution systems designed for its lower-volume, high-value RV business. These failures caused significant cost increases, including increased labor costs, delayed inventory stocking, distribution of less-desirable products, and related matters that delayed store openings and negatively impacted profit margins.  In fact, several Gander stores were closed just months after re-opening due to these concealed integration failures and the selection of poor-performing stores.

10.    Despite the dysfunction occurring behind the scenes, throughout the Class Period, defendants made overly rosy statements that concealed the increased costs and failures with the Gander stores' integration and rollout.  Moreover, defendants took advantage of Camping World's artificially inflated share price by conducting secondary stock offerings in May 2017, with an offering price that had climbed to $27.75 per share, and again in October 2017, with an offering price that had climbed to $40.50 per share.  Unlike the IPO, these secondary offerings were not designed to raise capital for the Company, but primarily to cash out the insiders by selling their stock.  Crestview, for example, sold more than 13 million shares of Camping World Class A stock in the secondary offerings for more than $450 million in gross proceeds.  The Company's CEO, Chief Financial Officer ("CFO"), Chief Operating Officer ("COO"), and President likewise all cashed out

- 4 -

shares of Camping World stock during the Class Period at inflated prices, collecting more than $70 million in gross proceeds.

11.     Then, toward the end of the Class Period, in a series of corrective disclosures, Camping World shocked investors by revealing, *inter alia,* that: (i) there were several material weaknesses in the Company's controls over financial reporting, resulting in an overstatement of the Company's financials; and (ii) the Company's integration and rollout of Gander stores was a "giant sh** show" with substantially higher costs that were negatively impacting the Company's profit margins by tens of millions of dollars.   The Gander store failures were the result of the incompatibility of the inventory and distribution systems Camping World used for its existing low-volume RV business and the newly acquired high-volume, lower-value Gander retail inventory. Those severe operational issues, which defendants knew or recklessly disregarded in conducting due diligence prior to the Gander acquisition, led to delayed store openings and stores being rushed open with less desirable inventory.

12.     Following the corrective disclosures, the Company's Class A common stock, which had traded above $47 per share during the Class Period, fell to $19 per share and now tracks around $15 per share, causing investors to suffer hundreds of millions of dollars in losses.  The dramatic decline in Camping World's stock price stands in stark contrast to the positive performance of the overall stock market during this period.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o, §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

- 5 -

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, §22 of the Securities Act, 15 U.S.C. §77v, and §27 of the Exchange Act, 15 U.S.C. §78aa.

15.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), §22 of the Securities Act, 15 U.S.C. §77v, and §27 of the Exchange Act, 15 U.S.C. §77aa.  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District, and the Company's corporate headquarters are located in this District.

16.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

17.     Plaintiffs assert securities fraud claims under the Exchange Act for materially false and misleading statements made during the Class Period against Camping World and certain of its officers, directors, and controlling shareholders.

18.     In addition, starting at ¶193 below, plaintiffs assert non-fraud claims under the Securities Act for false and misleading statements made in the registration statements and prospectuses issued in connection with the May 2017 Offering and October 2017 Offering against Camping World, certain of its officers, directors, and controlling shareholders, and the underwriters of the offerings.

## EXCHANGE ACT CLAIMS

**Plaintiffs**

19.     Lead plaintiff Oklahoma Police Pension & Retirement System purchased shares of Camping World Class A common stock during the Class Period and was damaged thereby, as detailed in its certification attached hereto and incorporated herein.

- 6 -

20.     Lead plaintiff City of Omaha Police & Fire Retirement System purchased shares of Camping World Class A common stock during the Class Period and was damaged thereby, as detailed in its certification attached hereto and incorporated herein.

21.     Lead plaintiff City of Pontiac General Employees' Retirement System purchased shares of Camping World Class A common stock during the Class Period, including in the May 2017 Offering, and was damaged thereby, as detailed in its certification attached hereto and incorporated herein.

22.     Named plaintiff Plumbers & Steamfitters Local Union #486 Pension Fund purchased shares of Camping World Class A common stock during the Class Period, including in the October 2017 Offering, and was damaged thereby, as detailed in its certification attached hereto and incorporated herein.

**Defendants**[1]

23.     Defendant Camping World is a retailer of RVs and outdoor supplies and accessories headquartered in Lincolnshire, Illinois.  The Company's Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CWH."

24.     Defendant Marcus A. Lemonis ("Lemonis") has served as Chairman of the Board and CEO of Camping World since the Company's IPO.

25.     Defendant Thomas F. Wolfe ("Wolfe") served as CFO of Camping World from the Company's IPO until January 2019.

26.     Defendant Brent L. Moody ("Moody") served as COO of Camping World from the Company's IPO until October 2018.

---

[1]     Additional defendants against whom Securities Act claims are alleged are listed in ¶¶199-209.

27.     Defendant Stephen Adams ("Adams") has served as a director of Camping World since the Company's IPO.

28.     The defendants referenced above in ¶¶24-27 are collectively referred to herein as the "Individual Defendants."

29.     Defendant Crestview Partners II GP, L.P. ("Crestview") is a private equity firm headquartered in New York City, New York.  Throughout the Class Period, Crestview and its affiliates held a substantial ownership stake in the Company and, together with Lemonis, controlled its actions.  Crestview also has several agreements and financial arrangements with the Company, both directly and through various affiliates.

30.     Defendant Crestview Advisors, L.L.C. ("Crestview Advisors") is a registered investment adviser to private equity funds, including the funds affiliated with Crestview that invested in Camping World.   Brian P. Cassidy, a partner at Crestview Advisors, and Jeffrey A. Marcus, the Vice Chairman of Crestview Advisors, have served as directors of Camping World since the Company's IPO.  Defendants Crestview and Crestview Advisors, together with their affiliates, are collectively referred to herein as the "Crestview Defendants."

**EVENTS LEADING UP TO THE CLASS PERIOD**

**Camping World Prior to the IPO**

31.     Defendant Lemonis rose to the top of Camping World through prior relationships and involvement in the RV industry.  Notably, he has been accused of making misrepresentations in prior business dealings, as he, among other things, ran and then fled an RV company that was headed toward a collapse.

32.     Camping World was founded in 1966, and has grown through a series of acquisitions since that time.  Camping World sells RVs, RV-related services, such as roadside assistance and protection plans, and RV-related products and accessories.  In addition to the Camping World brand,

- 8 -

the Company also owns Good Sam, which cross-sells products and services to RV owners and an RV membership service through its "Good Sam Club."

33.     Camping World had long been financially backed by defendant Adams, a private equity investor who served as the Chairman of various Camping World predecessors since the 1980s.  In or around 2002, Adams sought to acquire a struggling and cashed-strapped RV business, Holiday RV Superstores ("Holiday RV"), which was run by defendant Lemonis.  As Holiday RV became increasingly insolvent in 2003, Adams loaned it money and acquired shares, becoming the largest shareholder.  Around the same time, Lemonis resigned from Holiday RV and co-founded FreedomRoads, LLC ("FreedomRoads") another RV dealership business financially backed by Adams.

34.     Within a year, Holiday RV was delisted from the NASDAQ, and Holiday RV sued Lemonis for breaches of contract and fiduciary duty.  Thereafter, Adams acquired all shares of Holiday RV.  Other Holiday RV investors accused Lemonis of making misrepresentations to secure loans prior to his resignation.

35.     Lemonis then grew FreedomRoads through the rapid acquisition of RV dealerships. In 2006, Camping World and FreedomRoads formed a joint venture and Lemonis became the CEO and President of both companies.

36.     In 2011, Camping World formally combined with FreedomRoads, creating the largest RV dealership business and provider of products and services for RVs in North America.  Lemonis remained CEO and President of the combined entity.  Lemonis' desire to keep information secret was discussed in describing the business combination.  The *RV Daily Report* noted that the combination was "done in complete secrecy," and, as a result of the deal, Adams' investment group would no longer "publicly release its financial statements – documents that helped the industry understand the direction the company was headed."  The publication concluded, "[u]ndoubtedly,

- 9 -

Lemonis has decided that he's had enough of *RV Daily Report* releasing information to his customers and competitors . . . he wants to keep his cards close to his vest." Greg Gerber, *Stephen Adam Doubles Down on Marcus Lemonis*, RV Daily Report, Jan. 20, 2011, at 1.

37.     Over time, Lemonis acquired a massive stake in Camping World. Likewise, in or around 2011, the Crestview Defendants made several investments in Camping World, ultimately securing significant ownership holdings. As of Camping World's October 2016 IPO, defendant Lemonis, defendant Adams, and the Crestview Defendants jointly majority owned and controlled the Company.

38.     Defendants commenced the IPO to raise money from the public, but they did not want to give up their control. Through pre-IPO transactions entered into with Camping World and its subsidiaries, Lemonis, Adams, and the Crestview Defendants entrenched their majority ownership interests and ability to control the Company after the IPO, even if their exposure to the economic risks of share ownership substantially declined.

39.     First, to maintain voting control, defendants instituted a multi-share class structure with Classes A, B, and C shares. Only Class A shares are publicly traded. Classes B and C shares provide voting rights, but do not have an economic interest. Through their ownership of Classes A, B and C shares, Lemonis, Adams, and the Crestview Defendants collectively maintained more than 85% of the voting control over the Company, while outside investors, who hold only Class A shares, remained subject to a majority of the economic risk.

40.     Second, Lemonis, Adams, and the Crestview Defendants also have the right to appoint a majority of Camping World's nine-member board of directors ("Board"). Pursuant to a voting agreement, the Crestview Defendants have the right to designate up to four directors, defendants Lemonis and Adams have the right to designate up to four directors through their indirect ownership of certain entities, and defendant Lemonis has the right to appoint one director through

- 10 -

his ownership of the only Class C share. Under the voting agreement, the number of directors these parties are entitled to designate depends on their ownership of Camping World stock. At all relevant times, defendants have had the power to designate at least seven members of Camping World's Board, and they have maintained majority voting power to approve all of the Company's directors.

**The Camping World IPO**

41.     Camping World's IPO was conducted on October 6, 2016 and raised $261 million (less underwriter fees and discounts). Lemonis was appointed Chairman and CEO, Wolfe was appointed CFO, Moody was appointed COO, and Roger Nuttal was appointed President. As discussed above, the agreements and structure of the IPO allowed Lemonis and the Crestview Defendants to reap the benefits of taking Camping World public, but maintain the structure and control of a privately held company. As one expert commented upon reviewing Camping World's IPO documents, "[c]learly [Lemonis] wants to retain the benefits of private ownership but gain access to public markets. It's a win-win for him but a lose-lose for anybody on the outside."

42.     Moreover, unbeknownst to Camping World's public investors, the Company lacked the necessary infrastructure, including internal and disclosure controls, to meet the reporting requirements of a publicly-traded company. For example, as defendants would later admit, Camping World:

- had material weaknesses in internal controls, including deficient tax controls, inadequate policies and procedures in the FreedomRoads segment, ineffective transaction level and management review controls, and insufficient documentation of certain accounting policies and procedures; and

- had made several accounting errors, including failing to properly defer portions of certain revenue, apply vendor rebates against inventory, allocate intercompany revenue, and allocate intercompany markup costs.

**Camping World's Acquisition of Gander Stores**

43.     Gander Mountain was a big box retailer that did not sell RVs, but sold hunting and fishing equipment and related items for outdoor enthusiasts.  Before filing for bankruptcy, Gander Mountain had operated 160 retail stores.  Like many retail businesses, Gander was being hurt by online sales.  According to Gander Mountain's bankruptcy filings, it had "encountered substantial headwinds as sales ha[d] shifted from traditional brick and mortar retailers to online sellers."  In March 2017, Gander Mountain filed for Chapter 11 bankruptcy and announced that it would close and liquidate "underperforming or unprofitable" store locations while continuing to operate others through bankruptcy.

44.     Camping World's leadership saw Gander Mountain as a platform through which they could cross-sell RVs to outdoor enthusiasts.  Despite Camping World's accounting deficiencies described above, in May 2017, Camping World announced that it was expanding, as it had acquired assets of Gander Mountain out of bankruptcy.  Camping World, upon acquiring Gander Mountain assets, announced that it would close all stores and liquidate all inventory.  Camping World announced that it would reopen approximately 70 "historically profitable" Gander stores.

45.     The decision to close all stores and liquidate inventory meant that customers would be forced to find new suppliers for their outdoor goods and they would have to be won back upon store re-openings.  The longer the delays in re-opening, the more significant the challenge of winning back the customers.  In addition, the decision to liquidate inventory and rebuy inventory using Camping World's systems, rather than continuing to operate on Gander Mountain's inventory systems with Gander Mountain inventory, meant that Camping World would face increased inventory restocking, distribution, and personnel hiring challenges.

46.     Camping World incurred significant expense as a result of problems integrating the Gander stores into Camping World's inventory and distribution systems.  Integrating Gander's high-

volume, low-cost products into Camping World's systems on a rapid timeline resulted in mass dysfunction, causing Camping World to transport and pay busloads of Gander employees and contractors to manually input thousands of stock keeping units ("SKUs") that tracked product inventory and sales into those systems. This created inventory ordering delays and inefficiencies at Gander's distribution center.

47. The risks associated with using Camping World systems for Gander inventory were known or recklessly disregarded by defendants who made such decisions after conducting due diligence into the Gander Mountain acquisition. Given the stark differences between Camping World's existing RV dealerships and Gander Mountain's large retail stores, any reasonable due diligence by Camping World would include an investigation of the compatibility of Camping World's existing inventory management and distribution systems and the inventory and distribution necessary to open and run Gander Mountain stores.

48. Thus, in conducting due diligence on the Gander Mountain acquisition, and based on their public statements regarding the strategy to close, liquidate inventory, and then re-open stores, defendants knew or recklessly disregarded the risks of increased costs due to the incompatibility of Camping World's inventory and distribution systems with Gander's business and the need to completely restart inventory and distribution practices. Yet, defendants concealed not only these risks during the Class Period, but also that they were coming to fruition.

**DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS**

49. Throughout the Class Period, defendants made false and misleading statements regarding the true state of the Company's internal controls, historical accounting results, and the costs and success of the Gander store integration and rollout. Defendants repeatedly assured investors that the Company's internal controls were effective, its accounting complied with generally accepted accounting principles ("GAAP"), Gander stores were being selected based on historical

- 13 -

profitability, and the integration and rollout of Gander stores was a success and would not have a negative impact on financial performance. The Class Period begins on March 8, 2017, when Camping World announced its fourth quarter and full year 2016 financial results.

**False and Misleading Statements Regarding**
**Internal Controls and Financial Results**

50. On <u>March 8, 2017</u>, Camping World issued a release announcing its results for the fourth quarter and year ended December 31, 2016, which was filed with the SEC on Form 8-K ("FY 2016 Release"). The FY 2016 Release contained the following false and misleading statements:

(a)     The FY 2016 Release reported: ***basic earnings per share for the period of October 6, 2016 to December 31, 2016 of $0.11***; ***diluted earnings per share for the period of October 6, 2016 to December 31, 2016 of $0.09***; ***fourth quarter 2016 total net income of $13.6 million***; and ***fourth quarter net income attributable to Camping World, and excluding non-controlling interests, of $2.06 million***[2] (collectively, "Overstated EPS and Net Income Statements"); and

(b)     The FY 2016 Release stated that the financial results therein "***are presented in accordance with accounting principles generally accepted in the United States ('GAAP')***."

51. On <u>March 13, 2017</u>, Camping World filed with the SEC its annual report on Form 10-K for the year ended December 31, 2016 ("2016 10-K"). The 2016 10-K was signed personally or by power of attorney by defendants Lemonis, Wolfe, and Adams and contained the following false and misleading statements:

---

[2]     The false and misleading statements are addressed herein topically and in chronological order within each topic. However, the entirety of false and misleading statements must be considered in totality, because each of them served to reinforce the false and misleading nature of the others, and caused Camping World's stock price to be artificially inflated. Emphasis (bold and italics) has been added to highlight the particular statements alleged to be false and misleading statements in this section.

(a)     The 2016 10-K repeated the ***Overstated EPS and Net Income Statements*** set forth in ¶50 above;

(b)     The 2016 10-K stated that defendants Lemonis and Wolfe had evaluated the Company's disclosure controls and procedures and "***concluded that [the Company's] disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2016***" ("Disclosure Controls Statement");

(c)     The 2016 10-K stated that "***[t]here was no change in our internal control over financial reporting . . . identified in connection with the evaluation of our internal control performed during the fiscal quarter ended December 31, 2016, that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting***" ("Internal Controls Statement");

(d)     The 2016 10-K stated that the consolidated financial statements contained therein were "***prepared and presented in accordance with accounting principles generally accepted in the U.S. ('GAAP')***" ("Compliance with GAAP Statement"); and

(e)     The 2016 10-K included signed certifications by defendants Lemonis and Wolfe attesting that the 2016 10-K did not contain any untrue statements of material fact, or omit to state a material fact, and vouching for the accuracy of the Company's financial reports and effectiveness of its disclosure controls and internal controls.  The certifications stated:

Exhibit 31.1

**CERTIFICATIONS**

I, Marcus A. Lemonis, certify that:

1. I have reviewed this Annual Report on Form 10-K of Camping World Holdings, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) [Omitted]

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 13, 2017

By: /s/ Marcus A. Lemonis
Marcus A. Lemonis
Chairman and Chief Executive Officer
(Principal Executive Officer)

(f)     In particular, the representations in ¶¶2-3 of the signed Certifications (regarding the accuracy of the 2016 10-K and the financial results reported therein) and ¶¶4-5 of the signed Certifications (regarding the design and effectiveness of internal controls and lack of material weaknesses) of the foregoing certification were false and misleading when made ("Signed Certification Statements").

- 16 -

1537028_1

52.     On May 4, 2017, Camping World filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2017 ("1Q17 10-Q").  The 1Q17 10-Q was signed by defendant Wolfe and contained the following false and misleading statements:

(a)     The 1Q17 10-Q contained essentially the same ***Disclosure Controls Statement*** and ***Internal Controls Statement*** as in ¶51; and

(b)     The 1Q17 10-Q included ***Signed Certification Statements*** by defendants Lemonis and Wolfe in substantially the same form as in ¶51.

53.     On May 26, 2017, Camping World filed with the SEC a prospectus on Form 424(b)(4) in connection with the May 2017 Offering, which was part of a registration statement signed personally or by power of attorney by defendants Lemonis, Wolfe, and Adams.  The prospectus incorporated by reference the 2016 10-K, which included the same ***Overstated EPS and Net Income Statements*** as in ¶50; the same ***Disclosure Controls Statement*** and ***Internal Controls Statement*** as in ¶51; the same ***Signed Certification Statements*** by defendants Lemonis and Wolfe as in ¶51; and the same ***Compliance with GAAP Statement*** as in ¶51.

54.     On August 10, 2017, Camping World filed with the SEC its quarterly report on Form 10-Q for the quarter ended June 30, 2017 ("2Q17 10-Q").  The 2Q17 10-Q was signed by defendant Wolfe and contained the following false and misleading statements:

(a)     The 2Q17 10-Q contained essentially the same ***Disclosure Controls Statement*** and ***Internal Controls Statement*** as in ¶51; and

(b)     The 2Q17 10-Q included ***Signed Certification Statements*** by defendants Lemonis and Wolfe in substantially the same form as in ¶51.

55.     On October 27, 2017, Camping World filed with the SEC a prospectus on Form 424(b)(4) in connection with the October 2017 Offering, which was part of a registration statement signed personally or by power of attorney by defendants Lemonis, Wolfe, and Adams.  The

- 17 -

prospectus incorporated by reference the 2016 10-K which included the same *Overstated EPS and Net Income Statements* as in ¶50; the same *Disclosure Controls Statement* and *Internal Controls Statement* as in ¶51; the same *Signed Certification Statements* by defendants Lemonis and Wolfe as in ¶51; and the same *Compliance with GAAP Statement* as in ¶51.

56. On <u>November 9, 2017</u>, Camping World filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2017 ( "3Q17 10-Q").  The 3Q17 10-Q was signed by defendant Wolfe and contained the following false and misleading statements:

(a) The 3Q17 10-Q contained essentially the same *Disclosure Controls Statement* and *Internal Controls Statement* as in ¶51; and

(b) The 3Q17 10-Q included *Signed Certifications Statements* by defendants Lemonis and Wolfe in substantially the same form as in ¶51.

57. The statements set forth in ¶¶50-56 above were materially false and misleading when made.  The true facts, which were then known to or recklessly disregard by defendants, were:

(a) As of March 8, 2017, and continuing thereafter, the Company's internal controls and disclosure controls were not effective but in fact suffered from several material weaknesses,  including: (i) deficient tax controls; (ii) inadequate accounting policies and procedures in the FreedomRoads reporting segment; (iii) ineffective transaction-level and management review controls over the valuation of trade-in unit inventory; and (iv) insufficient documentation of certain accounting policies and procedures within the retail segment;

(b) As of March 8, 2017, and continuing thereafter, the Company's internal controls were not effective and the Company suffered material weaknesses that resulted in Camping World having failed to properly: (i) defer a portion of roadside assistance policies; (ii) apply vendor rebates against related inventory balances; (iii) allocate intercompany revenue from new and used

- 18 -

vehicles to consumer services and plans; and (iv) allocate intercompany markup costs applicable to new and used vehicles;

(c)     The Company's historical financial results reported in the 2016 Form 10-K had not been prepared and reported in accordance with GAAP; and

(d)     As a result of the numerous errors, misstatements, and material weaknesses listed in (a)-(c) above, the Company's financial statements included in the 2016 Form 10-K could not be relied on and its reported financial results were materially overstated, including: (i) basic EPS for the period from October 6, 2016 to December 31, 2016 were only $0.08 per share, rather than the $0.11 represented, an overstatement of more than 37%; (ii) diluted EPS for the period from October 6, 2016 to December 31, 2016 were only $0.07 per share, rather than the $0.09 represented, an overstatement of more than 28%; (iii) total net income for the three months ending December 31, 2016 was only $11.53 million, rather than the $13.6 million represented, an overstatement of more than 18%; and (iv) net income attributable to Camping World, and excluding non-controlling interests, for the three months ending December 31, 2016 was only $1.59 million, rather than the $2.06 million represented, an overstatement of more than 29%.

**False and Misleading Statements Regarding the Integration of Gander Stores**

58.     On May 1, 2017, Camping World issued a press release announcing that the Company had been chosen as the winning bidder at a bankruptcy auction for certain assets of Gander Mountain.  Defendants stated their plan was to liquidate the inventory of all stores and maximize profitability through inventory and store location selection.  The May 1, 2017 release contained the following false and misleading statements:

(a)     The May 1, 2017 press release quoted defendant Lemonis as claiming that the deal allowed Camping World to focus on opening only the profitable stores, stating

"'***The structure of our deal provides much flexibility and will*** not only ***allow us to refine the inventory selection and select only those stores which are profitable or we believe have a clear path to profitability***, but will also allow us to immediately offer our comprehensive portfolio of services, protection plans, products and resources to the existing Gander Mountain and Overton customer base and in stores in which we elect to operate."'

(b)     Regarding the inventory liquidation, the May 1, 2017 press release quoted defendant Lemonis as stating that "'***the liquidation of the existing Gander Mountain inventory will allow us to start with a clean slate of what we consider the appropriate mix and level of inventory***, including the addition of Camping World . . . offerings where appropriate, and our lease designation rights ***will allow us to select only those stores in appropriate locations with appropriate cost structures***.'"

(c)     The May 1, 2017 press release also quoted defendant Moody discussing the importance of inventory management and focusing on the stores with an appropriate cost structure, stating: "'***Camping World's plan is to immediately right size the inventory and operate only in retail locations with occupancy costs that we believe support profitable operations, with an extreme focus on corporate overhead and expenses, consistent with our other operating segments***."'

59.     On May 8, 2017, Camping World issued another press release providing an update regarding the Gander acquisition.  The release disclosed that Camping World would be opening seventy Gander stores and reinforced that inventory and store location would be used to maximize profitability.  The May 8, 2017 release contained the following false and misleading statements:

(a)     The May 8, 2017 release quoted Lemonis as stating that,

after reviewing the stores in more detail since our successful bid in the bankruptcy process, our current goal is operate seventy or more, locations subject to, among other things, our ability to negotiate lease terms with landlords on terms acceptable to us and approval of the Bankruptcy Court. ***The current liquidation of the existing Gander Mountain inventory will allow us to start with a clean slate of what we***

- 20 -

***consider the appropriate mix and level of inventory***, including the addition of Camping World and Overton's offerings where appropriate.

60.     On June 30, 2017, Camping World issued another press release providing a further update regarding the Gander stores. The press release stated that the list of Gander stores to reopen had been reduced to 57 and provided the list of the first 57 store locations. The June 30, 2017 press release quoted defendant Lemonis as stating, "'***we are not willing to open stores which we do not believe have a clear path to profitability***."'

61.     On August 10, 2017, several months into the Gander integration process, Camping World hosted an earnings conference call to discuss the results for the quarter ended June 30, 2017 ("2Q17"). Defendant Lemonis made the following false and misleading statements during the call:

(a)     Defendant Lemonis stated that the Company's "***current plan is to open the initial 15 to 20 Gander stores by the end of 2017***," and added, "***[a]s I've consistently stated, we will only open stores that have a historical level of profitability and also have a clear path to profitability in the future***"[3]; and

(b)     Regarding Gander store inventory, defendant Lemonis stated that Camping World would focus on higher margin, experiential-based products, rather than low margin commodity products, stating that "***we will not carry the level of apparel and footwear that we historically have because we believe that, that is not as experiential. It's more of a commodity-based business. And we want to carry the types of products and services that require human interaction with an expert and/or some level of installation or something you need just in time.***

---

[3]     Adding to the context of these statements, which reinforce investors' understanding that defendants would only open Gander stores that had been historically profitable and would maintain profit margins, defendant Lemonis, in describing the Company's "outdoors" acquisition strategy, stated, "we are still looking for things that have significant earnings behind them, that have significant principles in terms of EBITDA margin contribution consistent with our existing business."

- 21 -

*That is our defense mechanism against margin compression* competing with Amazon-type retailers."

62.     On <u>November 9, 2017</u>, Camping World hosted an earnings conference call to discuss the results for the quarter ended September 30, 2017 ("3Q17").  During the call, defendant Lemonis made the following false and misleading statements:

(a)     With regard to Gander store openings, defendant Lemonis reassured investors that stores were being selected to maintain profit margins, that he set conservative targets, and that defendants had a careful and deliberate plan to focus on stores with clear profitability, stating:

> We feel – Brent Moody and I have really been at the forefront of negotiating those leases.  And as we said from day one, we – *the Company will not sign up for any leases that we believe don't give us more than a clear path to profitability*; *profitability, quite frankly, on a four-wall basis that's consistent with our EBITDA margin expectation, like we currently operate at*.
>
> One of the things that we've done is we've elected to shrink the size of the boxes that the Company currently – historically had.  When they were boxes that were 80,000, 90,000, 100,000, *we elected to pass on those [stores] because we didn't – after analysis, did not like the turning of the inventory and the margins associated with that and the return on capital.  And so, a lot of the stores that we elected to take have low rent factors* but have slightly smaller footprints: 30,000, 40,000, 50,000, as opposed to 60,000, 70,000, 80,000.  *We believe that we're going to be able to generate solid sales, but more importantly, solid profitability out of those*.
>
> *           *           *
>
> *We could have probably opened the stores a little earlier.  But for Brent and I and the management team, it was about getting the leases right, getting the merchandising right, getting the customer experience right.*  And what we want to do is sell experience.  And what we won't do is do what some other outdoor retailers have done, which is just sell on price all the time.  We believe we have to start with service after the sale as our lead, as opposed to selling solely and singularly on price.  So we're very excited about next year.
>
> I don't have a specific forecast of where we'll be in 2018 because the stores are going to stagger their opening.  We're going to work to get 15 to 20 – I think it's going to be closer to 15 – in the first-quarter open.  *We want to open them profitability and intelligently*, but they are going to layer in over the year.

- 22 -

One of the things that everybody on this call knows is ***I do not set any expectations that I do not think I can absolutely hit***. And it is our expectation that in 2019 that business will do somewhere north of $300 million of revenue. But more importantly, much more importantly, we think the contribution from those 60-some stores would be in the 8% EBITDA margin range. ***That is our focus; it's maximizing the EBITDA margin on the revenue***.

(b)     In discussing the opening of Gander stores, Lemonis stated: "The ***growth*** of our outdoor categories ***will initially come from the opening of stores: the ones that we thought were the most profitable in the markets that could give us the best yield*** on our database."

63.     The statements set forth in ¶¶58-62 above were materially false and misleading when made. The true facts, which were then known to or recklessly disregard by defendants, were:

(a)     Contrary to Lemonis' statements that they were focused on maintaining margins through inventory and store location selection, the Gander store pre-opening costs, inventory disruptions, and delays were and would continue to cost millions of dollars that would negatively impact margins;

(b)     Delays in Gander store openings were expected to negatively impact the profitability of Gander stores, as it would become more and more difficult to win back customers who were in the process of finding alternative suppliers due to store opening delays;

(c)     Contrary to Lemonis' statements that they were passing on store openings and delaying store openings to ensure profitability, store openings were delayed due to integration failures that, for example, required manual entry of thousands of SKUs;

(d)     Contrary to Moody's statements that they would "right size" the inventory and have an "extreme focus" on expenses, the implementation of a new operating system and the decision to liquidate all Gander inventory delayed the opening of stores, as the Company needed to acquire sufficient inventory to stock the stores, and the difficulty of stocking inventory was compounded by the fact that Camping World utilized its own distribution practices and technology

- 23 -

for inventory management (*e.g.*, SKUs), which were geared toward large, single items, like RVs and not toward Gander's high volume, smaller products, all of which was increasing the costs of opening the Gander stores;

(e)     The Company did not "only open [Gander] stores that had a historical level of profitability" or "the most profitable" Gander stores, but rather was planning to rush to open Gander stores that historically were not among the highly profitable and high-performing stores prior to Gander's bankruptcy, and, in some cases, were among the historically worst-performing stores that had and would continue to negatively impact margins;

(f)     Contrary to Lemonis' statement that he did not set expectations that he did not think he could absolutely hit, Lemonis was concealing the material negative events that occurred during the integration of Gander inventory into Camping World's systems due to inventory, distribution, and technological incompatibility, which required the manual entry of SKUs, the loss of SKUs during the process of uploading into the inventory system, SKUs becoming uncoupled from the products they were supposed to identify, an understaffed distribution center, difficulties in receiving inventory at the distribution center, lost inventory, and inventory backlogs, resulting in delayed inventory orders, delayed opening of stores, loss of price concessions, and increased pre-opening store costs; and

(g)     As a result of the inventory management failures and defendants' desire to avoid further postponement of store openings, and contrary to what they told the market, the Company selected poorer performing stores and could not focus on stocking stores with higher profit margin "experiential" inventory, but rather, needed to fill the stores with commodity products or products (regardless of profitability) based on availability which negatively impacted margins.

- 24 -

64.     On January 4, 2018, Camping World issued a press release providing a list of 69 Gander stores it planned to open in 2018.  The press release reiterated that defendant "'Lemonis previously stated his intention of *operating stores with a clear path to profitability*.'"

65.     On February 27, 2018, the Company issued a press release announcing its results for the fourth quarter and year ended December 31, 2017, which was filed with the SEC on Form 8-K ("FY 2017 Release").  The FY 2017 Release stated that "'*[w]e began opening our first Gander Outdoors stores in December 2017 and are pleased with the early trends*, including Good Sam Club conversion rates at these stores.'"

66.     On the same day, Camping World hosted an earnings conference call to discuss the results for the full year and quarter ended December 31, 2017.  During the call defendant Lemonis made the following false and misleading statements:

    (a)     Defendant Lemonis stated:

        *We opened our first Gander Outdoors store in December and currently have 11 stores up and running.  Early trends in these stores have been very promising* and we're seeing healthy early conversion rates of Gander customers to our Good Sam Club and our Good Sam credit card.  Our plan is to open nearly 72 Gander Outdoor stores by mid-June.

        *As I've said many times, we're being very calculated and disciplined in how we open stores and how we manage this business.  We are only interested in operating stores that we believe have a clear path to profitability*.  We've aggressively negotiated rents, *diversified the mix of merchandise*, added a service department and layered out – on a number of new benefits and savings to our Good Sam Club for the Gander Outdoors and Overton's customers.

    (b)     Lemonis provided the Company's financial guidance for 2018, noting the pre-opening expenses for Gander and confirming they would not negatively impact profit margins, stating:

        Our initial outlook for 2018 calls for revenue in the $4.8 billion to $5 billion range and an *adjusted EBITDA in the range of $431 million to $441 million*.  These estimates include approximately $400 million in revenue for the outdoor and active

- 25 -

sports business and *$30 million in preopening expenses for the Gander Outdoors stores.*

      *We do not anticipate that Gander Outdoors stores will have much impact on the company's adjusted EBITDA in 2018.* With the Gander Outdoors stores opening in the first half of the year and their peak selling season being the third and fourth quarters, *we would expect the Gander Outdoors stores to be a drag on the adjusted EBITDA in the first half of the year and accretive in the second half of the year*.

      (c)    In response to a follow-up question about the Gander pre-opening expenses,

Lemonis stated:

      *The most important thing for us in this Gander Outdoors opening process was to get it right the first time and so many retailers are in such a hurry to open stuff that they end up signing up for leases that they shouldn't, taking on products that they shouldn't, opening at the wrong time, hiring staff that they shouldn't.* And what I told the team was that we only have one shot to do this. And *by getting the supply chain right* and picking the right vendors *and picking the right locations* and really rolling this out as a nontraditional retail model with a heavy service component and a heavy Good Sam component.

      67.    On <u>March 13, 2018</u>, Camping World belatedly filed with the SEC its annual report on

Form 10-K for the year ended December 31, 2017 ("2017 10-K"). The 2017 10-K was signed by

defendants Lemonis, Wolfe, and Adams and contained the following false and misleading

statements:

      (a)    Regarding the Gander stores distribution center, the 2017 10-K stated:

We distribute our Gander Outdoors, Overton's and other Outdoor and Active Sports Retail merchandise from three leased and one owned distribution centers in Greenville, South Carolina, Lebanon, Indiana, St. Paul, Minnesota and Skokie, Illinois, which are 496,443, 707,952, 200,348 and 6,000 square feet, respectively.

      *Our distribution centers have scalable systems and processes that we believe can accommodate continued new store growth*. We use an Oracle enterprise system to procure inventory, manage online customer and retail demand and fulfill orders through the warehouse management module. Additionally, we have customized an order packing and shipping software package to handle the specific requirements of the e-commerce and retail business. *We have the capability to both case pick and item pick, which is designed to ensure our retail locations have sufficient quantities of product while also allowing us to maintain in inventory slow moving*

- 26 -

*but necessary items. This balance allows us to stock the right products at the necessary locations, all at the right time and in the correct quantity*.

(b)　　The 2017 10-K stated that the Company "*plan[ed] to operate a total of 74 Gander Outdoors stores by May 2018*," and that the Company "*expect[s] to incur approximately $30.0 million in incremental pre-opening expenses in 2018 related to these store openings*."

68.　　On <u>May 8, 2018</u>, the Company hosted an earnings conference call to discuss the results of the quarter ended March 31, 2018 ("1Q18").  Defendants made partial disclosures about the true state of the Gander acquisition and rollout (*see* ¶¶79-80), but defendant Lemonis made the following false and misleading statements:

(a)　　Lemonis reiterated the Company's 2018 EBITDA guidance, which reflected a lack of any negative impact on margins from the opening of the Gander stores, stating: "*Our [2018] outlook is for* revenue in the $4.8 billion to $5 billion range and *adjusted EBITDA in the $431 to $441 million . . . range.  These estimates include* approximately $400 million of revenue for the outdoor and active sports businesses and *$34 million of preopening expenses for Gander*."; and

(b)　　When asked about the Company's guidance, Lemonis answered in part:

> The Gander Outdoors process, *I intentionally slowed down because I really felt that both the customers and the shareholders wanted to see us execute that strategy for the long term. And so they have not gotten opened as quickly as we wanted them to. And we have not taken the circus approach to opening them by just setting off fireworks and spending a ton of money grand opening them*.  We've soft opened them.  In some of the markets, they've opened up like a blaze of glory.  In other markets, they've been a little slower. . . .  But if we believe that there is going to be any adjustment to that second quarter, we promise that we will communicate that.  *We're still feeling very confident about our full year.*  We just don't know if any of that's going to shift around a little bit, and we'll have some visibility into it over the next, call it, 2, 3 weeks. But *we feel confident with our annual number*.

69.　　The statements set forth in ¶¶64-68 above were materially false and misleading when made.  The true facts, which were then known to or recklessly disregard by defendants, were:

- 27 -

(a)     Defendant Lemonis did not "intentionally" slow down the opening of Gander stores, but rather delays in opening Gander stores were caused by material negative events that occurred during the integration of Gander inventory into Camping World's systems due to inventory, distribution, and technological incompatibility, which required the manual entry of SKUs, the loss of SKUs during the process of uploading into the inventory system, and SKUs becoming uncoupled from the products they were supposed to identify;

(b)     Camping World distribution centers did not have scalable systems to "accommodate continued new store growth," but were understaffed and had difficulties with receiving inventory, lost inventory, and inventory backlogs, resulting in delayed inventory orders, delayed opening of stores, loss of price concessions, and increased pre-opening store costs;

(c)     Delays in Gander store openings would materially impact the profitability of Gander stores, as it would become more and more difficult to win back customers who were in the process of finding alternative suppliers for the products they desired;

(d)     The Company was not "calculated" or "disciplined" with the opening process and did not only open stores with a "a clear path to profitability," but as a result of delays from the failed integration and rollout was rushing to open Gander stores that historically were not among the high-performing stores prior to Gander's bankruptcy, and, in some cases, were among the historically worst-performing stores;

(e)     The decision to liquidate all Gander inventory delayed the opening of stores, as the Company needed to acquire sufficient inventory to stock the stores and the difficulty of stocking inventory was compounded by the fact that Camping World utilized its distribution practices and technology for inventory management (*e.g.*, SKUs), which were geared toward large, single items, like RVs and not toward Gander's high volume, smaller products, all of which was increasing the costs of opening the Gander stores;

- 28 -

1537028_1

(f)     As a result of the inventory management failures and defendants' desire to avoid further postponement of store openings, and contrary to what they told the market, the Company could not focus on stocking stores with "the right products . . . at the right time and in the correct quantity" or with the right "mix of merchandise," but rather needed to fill the stores with commodity products or products (regardless of profitability) based on availability, which negatively impacted margins;

(g)     Despite the overly rosy and optimistic statements regarding Gander integration and rollout, defendants in truth were rushing to open underperforming Gander stores to cover up delays from the integration and rollout failures and the substantially higher than expected pre-opening costs, and were filling stores with less desirable inventory, as described in subparagraphs (a)-(f) above, each of which negatively impacted the Company's profit margins;

(h)     As a result of the integration and rollout failures, Camping World was not on track to  "operate a total of 74 Gander . . . stores by May 2018" and, in fact, Camping World operated no more than 42 stores by May 2018; and

(i)     As a result of subparagraphs (a)-(h) above, defendants had no reasonable basis to believe and, in fact, did not believe, that Camping World could achieve 2018 adjusted EBITDA of $431 million to $441 million, pre-opening expenses for Gander stores would only be $30 or $34 million, or that Gander stores would not adversely impact 2018 adjusted EBIDTA.

## DEFENDANTS' FAILURE TO DISCLOSE INFORMATION
## REQUIRED UNDER ITEM 303 OF REGULATION S-K

70.     SEC Regulation S-K required that Camping World's annual reports on Form 10-K and quarterly reports on Form 10-Q contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A").  According to the SEC, "MD&A is intended to give investors an opportunity to look at the [Company] through the eyes of management by

providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the [Company's] prospects for the future."

71.     Item 303 of SEC Regulation S-K, 17 C.F.R. §229.30 ("Item 303"), specifically required Camping World's Form 10-Ks and Form 10-Qs to describe "any known trends or uncertainties that have had or that [the Company] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii). It also required Camping World's Form 10-Ks and Form 10-Qs to disclose events that would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii).

72.     In violation of Item 303, the 3Q17 10-Q, 2017 10-K, and quarterly report on Form 10-Q for the period ended March 31, 2018 ("1Q18 10-Q") , which was filed with the SEC on May 8, 2018 and signed by defendant Wolfe, failed to disclose material trends, events and uncertainties known to management that were reasonably expected to have a material adverse effect on the Company's resources and results of operations, including:

(a)     The Company had decided to rush to open Gander stores that historically were not among the highly profitable and high-performing stores prior to Gander's bankruptcy, and, in some cases, were among the historically worst-performing Gander stores;

(b)     The Company's decision to liquidate all Gander inventory delayed the opening of stores, as the Company needed to acquire sufficient inventory to stock the stores and the difficulty of stocking inventory was compounded by the fact that Camping World utilized its existing distribution practices and technology for inventory management (*e.g.*, SKUs), which were

- 30 -

geared toward large, single items, like RVs and not toward Gander's high volume, smaller products, all of which was increasing the costs of opening the Gander stores;

(c)     Camping World was facing material negative events that occurred during the integration of Gander inventory into Camping World's systems due to inventory, distribution, and technological incompatibility, which required the manual entry of SKUs, the loss of SKUs during the process of uploading into the inventory system, SKUs becoming uncoupled from the products they were supposed to identify, an understaffed distribution center, difficulties in receiving inventory at the distribution center, lost inventory, and inventory backlogs, resulting in delayed inventory orders, delayed opening of stores, loss of price concessions, and increased pre-opening store costs;

(d)     As a result of the integration and rollout failures, and defendants' desire to avoid further postponement of store openings, the Company was filling Gander stores with less desirable inventory such as commodity products or out-of-season products (regardless of profitability) based on availability, which negatively impacted margins; and

(e)     The events described in subparagraphs (a)-(d) above, each negatively impacted the Company's profit margins and results of operations.

## SUBSEQUENT EVENTS

73.     Starting in late February 2018, the truth about Camping World's material weaknesses in internal controls and the Company's serious integration and rollout failures with the Gander stores began to leak out over the course of a series of disclosures, causing massive declines in the price of Camping World Class A common stock.

**Defendants Admit Material Weaknesses in
Internal Controls and Misstated Earnings**

74.     On February 27, 2018, Camping World admitted it had identified material weaknesses in its internal controls and needed to restate its prior financials.  On that day, Camping

- 31 -

World issued the FY 2017 Release, announcing its financial results for the fourth quarter and full year 2017. The FY 2017 Release disclosed that the Company would need to revise prior reporting periods due to various accounting errors, including: (i) the lack of deferral of a portion of roadside assistance policies sold with the sale of vehicles; (ii) the application of a portion of certain vendor rebates against the related inventory balances; (iii) the elimination of the intercompany allocation of certain revenue from new and used vehicles to consumer services and plans; and (iv) the allocation of the intercompany markup between costs applicable to new and used vehicles.

75.     The FY 2017 Release disclosed that the cumulative impact of these misstatements required the Company to (i) restate and reduce its 2016 basic EPS from $0.11 per share to $0.08 per share, as the prior reported basic EPS had been overstated by more than 37%; (ii) restate and reduce its 2016 diluted EPS from $0.09 per share to $0.07 per share, as the prior reported diluted EPS had been overstated by more than 28%; (iii) restate and reduce its fourth quarter 2016 total net income from $13.6 million to $11.53 million, as the prior reported net income had been overstated by more than 18%; and (iv) restate and reduce its fourth quarter 2016 net income attributable to Camping World, excluding non-controlling interests, from $2.06 million to $1.59 million, as the prior reported net income attributable to Camping World, excluding non-controlling interests, had been overstated by more than 29%. The FY 2017 Release further disclosed that the Company was continuing to assess the "potential impact of the recently identified material weaknesses in [Camping World's] internal control over financial reporting."

76.     Pursuant to 17 C.F.R. §249.310(a), Camping World was required to file the 2017 10-K on March 1, 2018, but Camping World failed to file by the close of trading on March 1, 2018. After the market closed, Camping World filed a Notification of Late Filing on Form 12b-25 with the SEC, stating that Camping World would be unable to timely file the 2017 10-K due to "material weaknesses in its internal control over financial reporting relating to the insufficient documentation

- 32 -

of certain accounting policies and procedures within the Company's retail segment, and ineffective transactional level and management review controls over the valuation of used trade-in inventory," which "required the Company to perform additional procedures and analyses in connection with the Company's annual financial statement close process and preparation of the Form 10-K."

77.     On this news of Camping World's material weaknesses in its internal controls, overstated financial results, and accounting errors, the price of Camping World stock declined substantially.  The magnitude and impact of the material weaknesses in internal controls appeared to be leaked into the market over several days as reflected in unusual trading volume and price declines in the absence of other Company-specific disclosures.  In total, from the close of trading on February 26, 2018 through the close of trading on March 5, 2018, the price of Camping World Class A common stock dropped $5.80 per share, or approximately 13.5%, on abnormally high trading volume.

78.     Thereafter, on March 13, 2018, Camping World belatedly filed its 2017 10-K.  In the 2017 10-K, Camping World confirmed that its "previously issued consolidated financial statements as of and for the year ended December 31 2016, and as of and for the three months ended March 31, 2017, three and six months ended June 30, 2017 and three and nine months ended September 30, 2017 . . . should no longer be relied upon."  Camping World confirmed in a Form 8-K that its disclosure controls and procedures were not effective as of December 31, 2016, March 31, 2017, June 30, 2017, September 30, 2017 and December 31, 2017, and that its internal controls over financial reporting were not effective as of December 31, 2017.

**Defendants Admit the Failures in the Gander
Integration and Rollout**

79.     Between the March disclosures set forth above and May 8, 2018, Camping World's stock price dropped from approximately $37 to $27 per share.  On May 8, 2018, Camping World

- 33 -

reported disappointing financial results for 1Q18. During the quarter, Camping World's adjusted EBITDA margin had decreased from 8.2% in the first quarter of 2017 to 6.8% for the first quarter of 2018. During the conference call to discuss the quarterly results, defendant Wolfe stated that "adjusted EBITDA for the outdoor stores for the first quarter was about $8.9 million loss." Lemonis admitted to opening fewer stores and began to admit the integration problems that caused the delayed Gander store openings and increased costs, stating:

> We've opened up 42 new Gander locations, which admittedly have opened a little later than I anticipated. Given the number of stores we're opening in a relatively short period of time and the fact that we are completely rebuilding the business, the inventory and the staff from scratch, there are challenges on several fronts, including our IT infrastructure, inventory management and distribution systems.

80. Later in the call, in response to analyst questions, defendant Lemonis was more blunt in his assessment, revealing that the behind-the-scenes integration of Gander stores was a "giant sh** show," and revealing the massive inventory, distribution, and technological issues being confronted, and increased labor costs in manually addressing the issues, stating:

> [W]hen I visited the distribution center in Lebanon, I probably have never experienced anything like it. When you take 600,000 square feet of an empty distribution center and you try to add hundreds of thousands of new SKUs and hundreds – and thousands of new vendors and you literally move all that product in on a brand-new operating system that you've never used before and then you have to move all that product out, it was kind of a giant shit show. And we had – luckily, we had store staff from around the country get on school buses in Greyhounds and drive to the distribution center and stay in hotels and RVs and work 14, 15 hours trying to get the product out for their store. I mean, what an unbelievable team effort. But nobody wants to hear that. What they want to know is that it was a perfect process. And it wasn't.

81. On this news, the price of Camping World Class A stock fell $4.60 per share, or 17%, on abnormally high trading volume to close at $23.02 per share on May 8, 2018.

82. In addition, several analysts slashed their price targets. For example, in a May 8, 2018 report, analysts from BMO Capital Markets cut their price target by around 30%, citing the

disclosures from "a very poorly executed earnings conference call" that could "have a detrimental effect on investors' view of the company and leadership team." The analysts noted that "the delays and higher-than expected costs of getting Gander up and running is becoming harder for investors to overlook," and noted that Gander stores "contributed an $8.9 million adjusted EBITDA loss in the quarter."

83.    On August 7, 2018, Camping World reported more disappointing financial results for the second quarter of 2018 ("2Q18") and lowered financial guidance for the remainder of 2018. The Company revealed that it had achieved adjusted EBITDA of only $140.2 million for the quarter, 9% below its low-end guidance of $154 million, and that its adjusted EBITDA margin had again declined on a year-over-year basis from 11.1% in 2Q17 to 9.7% in 2Q18.

84.    Moreover, on a conference call to discuss the 2Q18 results, defendant Lemonis revealed that Camping World was only on track to achieve 2018 adjusted EBITDA of $370 million to $380 million, a decline of 14% from prior guidance of $431 to $441 million. Lemonis and the Company revealed that the cause of the adjusted EBITDA miss and guidance reduction were related to the increased Gander costs, which were negatively impacting margins.

85.    More specifically, Camping World disclosed "$15.4 million of preopening expenses related to [the] Gander Outdoors" store opening, which, combined with the 1Q18 pre-opening costs of $19.7 million, revealed that in just the first six months of 2018, the Company had already exceeded its full year pre-opening costs guidance of $30 million. An analyst commented to Lemonis that "it looks like Gander will be on the order of a $60 million EBITDA loss this year," to which Lemonis admitted, "Yes, sir."

86.    On this news, the price of Camping World Class A stock fell $3.17 per share, or 14%, on abnormally high trading volume to close at $19.04 per share on August 8, 2018, and several analysts again slashed their price targets. For example, analysts from Wells Fargo Securities cut

their Camping World price target and noted that "investors are incrementally concerned over accelerated up-front 2018 Gander costs."

87. In total, from February 26, 2018 – when Camping World Class A common stock closed at $43.03 per share to August 8, 2018 – when Camping World Class A common stock closed at $19.04 per share, Camping World Class A common stock declined by $23.99 per share, or 56%. The price of Camping World Class A common stock has continued to decline to around $15 per share.

## FORMER EMPLOYEE ACCOUNTS REGARDING GANDER

88. Several former Camping World employees, who worked for Gander after Camping World purchased the stores out of bankruptcy, provided information that gives further context for the allegations herein.

**Selecting Poor Performing Gander Stores for Reopening**

89. Gander former employee 1 ("FE1") was a manager in the merchandising department who worked at Gander before and after the acquisition by Camping World. FE1 worked in Gander's corporate office and was responsible for merchandise planning.

90. According to FE1, in or around May 2017, after the Gander acquisition was publicly announced, he/she participated in conference calls with Lemonis and Gander's Marketing Director to discuss which Gander stores would be re-opened. FE1 said that Lemonis named a number of stores for which he was negotiating leases. Among the stores Lemonis named were those located in Paducah, Kentucky, and Florence, Alabama. FE1 was informed by Gander's VP of Operations that the VP of Operations had told Lemonis that these stores and other stores he listed were poor-

- 36 -

performing Gander Mountain stores and that they should not be re-opened.[4]  However, Lemonis chose to re-open both stores and both Gander stores have since been closed.  The Paducah, Kentucky store was opened in February 2018 and closed in December 2018, and the Florence, Alabama store was opened in May 2018 and then quickly closed in September 2018, just months after it re-opened.

91.    Gander former employee 2 ("FE2") was a Senior Inventory Manager who worked for Gander from June 2017 to June 2018 overseeing inventory for all of the Gander brick-and-mortar stores and had previously worked at Gander Mountain for nearly a year before its bankruptcy. According to FE2, in June and July 2017 management for Gander held budgeting meetings to discuss the re-opening of the Gander stores.  These meetings were attended by the VP of Merchandising, the VP of Operations, the VP of Inventory and Logistics (hereafter the "VPs"), defendant Wolfe, and the President of Camping World, Roger Nuttall.  During these budgeting meetings, the attendees discussed and were made aware that the closure of all the Gander Mountain stores made it difficult to recapture Gander customers who would shop elsewhere during the store closures and that the liquidation of all of Gander Mountain's inventory made stocking the new Gander stores with entirely new inventory time consuming and costly.

92.    According to FE2, in June 2017 he/she received a list of Gander stores Lemonis planned to open that was circulated internally and used to complete budget and revenue forecasting. This initial list of 70 Gander stores contained locations that had historically performed poorly as Gander Mountain stores.

93.    Beginning in July 2017, FE2 would receive emails updating the list of Gander stores Lemonis planned to open and the order in which Lemonis planned to open those stores.  In early July

---

[4]     On June 30, 2017, Camping World issued a release listing stores it was planning on opening, which included the Paducah, Kentucky store, and, on January 4, 2018, Camping World issued another release listing stores it was planning on opening, which included the Florence, Alabama store.

2017, FE2 and others raised concerns to the VP of Merchandizing when he/she saw high-performing stores taken off the list and low-performing stores being added. For example, in July 2017, when one of Gander Mountain's highest-performing stores, the Palm Beach store, was taken off the list of stores Lemonis planned to open, FE2 told the VP of Merchandising that the Palm Beach store was one of Gander Mountain's highest-performing stores and expressed worry that Gander was no longer planning to open this store. The VP of Merchandising told FE2 that Lemonis said the reason Gander was not opening the store in Palm Beach, Florida was because the city of Palm Beach would not allow Gander to sell RVs.[5] Gander ultimately did not re-open the Palm Beach store.

94. According to FE2, from July 2017 to November 2017, he/she continued to raise concerns to the VPs about re-opening some of the lowest-performing Gander Mountain stores. When FE2 raised concerns to the VPs about opening certain low-performing stores he/she was told that Lemonis said it was "all about the leases."

95. FE2's account regarding Camping World reopening underperforming and less profitable stores is similar to the fact that Camping World opened certain of the stores Gander Mountain itself had identified as "underperforming or unprofitable" in connection with the bankruptcy proceedings.[6]

---

[5]    Lemonis' statement to the VP of Merchandising is corroborated by a May 12, 2017 tweet from Lemonis where, in response to a question about the "palm beach gardens" Gander location re-opening, Lemonis tweeted, "[t]he city said go away. No rvs will be sold here."

[6]    For example, a Gander Mountain bankruptcy filing identified stores in Augusta, Georgia, Greenfield, Indiana, and Eau Claire, Wisconsin as "underperforming or unprofitable." *See In re: Gander Mountain Company*, Case No. 17-30673 (Bankr. D. Minn. March 10, 2017) at ECF No. 32. These stores were opened as Gander stores.

**Technology Incompatibility and Inventory
Disruptions[7]**

96.     According to FE2, in August 2017, employees for Gander began the process of entering the inventory of the high-volume retail Gander stores into the Camping World inventory system.  In order to integrate the Gander products with the Camping World inventory system, Gander employees needed to enter into the system approximately 100,000 SKUs, the unique identifiers or codes for each product that captures its description, material, size, color, packaging, and warranty terms.  According to FE2, SKUs are used by Gander to track inventory, order products, and invoice vendors.

97.     FE2 reported that inventory directors targeted early September 2017 for entering the majority of the SKUs needed to order and track inventory for the Gander stores into the Camping World inventory system.  According to FE2, the majority of the SKUs had to be entered before buyers could purchase inventory and inventory could be shipped to the distribution center and delivered to the Gander stores for their re-opening.

98.     Gander former employee 3 ("FE3") was a Director for Gander from July 2017 to October 2018.  FE3 developed merchandising and inventory strategy and supervised the purchasing of inventory for the new Gander stores.  FE3 reported to Gander's VP of Merchandising.  According to FE3, in August 2017, he/she and others at Gander who were dealing with inventory and merchandising were trained on using the Camping World inventory system.  FE3 said that he/she and others at Gander who were using the Camping World inventory system realized that the inventory system was not adequate for Gander's high-volume retail needs.  Specifically, the Camping World inventory system required SKUs to be entered manually and did not have the

---

[7]     On May 8, 2018, Lemonis discussed the disruption from buying new Gander inventory and integrating it into a new technology platform, referring to having "thousands of new vendors and you literally move all that product in on a brand-new operating system that you've never used before and then you have to move all that product out, it was kind of a giant sh** show."

capacity to input a high number of SKUs at once. In August 2017, FE3 told the VPs about the inadequacy of the Camping World inventory system informally as well as at weekly status meetings.

99. According to FE2, during August and September 2017, Gander encountered additional problems with the Camping World inventory system and with entering the Gander SKUs into that system. FE2 said that Gander employees would manually enter SKUs into the system during the day and the SKUs were uploaded into the system overnight. However, as FE2 and others monitored the overnight progress of the SKU uploads into the inventory system, they saw that the inventory system often rejected some or all of the SKUs that were entered. In addition, SKUs in the Camping World inventory system would become uncoupled from the products they were supposed to identify so that an SKU that was supposed to be identified with one product would instead be in the inventory system as an entirely different product.

100. FE3 also confirmed that SKU data would be rejected or contain errors when it was uploaded into the Camping World inventory system.

101. In August and September 2017, FE2 communicated to the VPs at weekly meetings the issues Gander was having uploading the SKUs into the inventory system. During those weekly meetings, FE3 also communicated to the VPs the problems Gander was experiencing with the inventory system. According to FE3, other Directors voiced the same concerns during these meetings.

102. According to FE2, in August 2017, he/she and another Director advised the VPs that Gander should use the inventory system previously utilized by Gander Mountain or replace the Camping World inventory system with a system that could handle Gander's retail inventory. Camping World did not heed this request.

103. According to FE2, as a result of the problems entering the SKUs into the Camping World inventory system, there would be days in August and September 2017 when no SKUs could

- 40 -

be loaded into the system. FE2 stated that, because of the delays caused by the problems with the inventory system, Gander missed the deadline for entering the SKUs into the system. FE2 said that, because the SKUs were not set up in the inventory system, Gander had to push back the ordering of inventory for the new Gander stores. FE2 initially planned to begin ordering inventory in early September 2017 so that inventory for the new stores could be shipped to the distribution center by late September 2017. Instead, according to FE2, Gander was not able to begin ordering inventory until October 2017 and inventory did not begin arriving at the distribution center until at least late-October. At weekly meetings in September and October 2017, FE2 discussed with the VPs the delays in ordering inventory for the Gander stores and in the inventory being received at the distribution center.

104.    In addition, FE2 recalls that in August 2017 he/she discussed inventory purchasing for the Gander stores with the VPs at weekly meetings. Specifically, FE2 informed the VPs that Gander was purchasing inventory that, based on past sales data from Gander Mountain, had not previously sold. FE2 informed Gander's VP of Merchandising that a number of products were not selling and cautioned him on overstocking the Gander stores with inventory.

105.    According to FE2, in November 2017 he/she told Gander's VP of Merchandising that overstocking inventory and purchasing inventory that had not previously sold could lead to items being placed on clearance, reducing the profit margins on those items and eating into the sales of newly stocked merchandise. However, as FE2 recalls, Gander's VP of Merchandising and VP of Operations told FE2 to ship more inventory to the Ganders stores, and that Lemonis wanted the stores full.

**Problems at the Gander Distribution Center**

106.    In August 2017, according to FE2, Gander planned to ship $10-$12 million of inventory a week to the distribution center beginning in the first week of October 2017. Gander

- 41 -

intended to begin receiving inventory in the first week of October so that merchandise could be shipped to the new stores in time for their re-opening. Gander staffed the distribution center accordingly. FE2 said that the VPs discussed the plan to ship inventory and the staffing of the distribution center at weekly meetings he/she attended.

107.    However, as FE2 stated, the delay in ordering merchandise – due to the problems entering SKUs into the inventory system and the delay in purchasing inventory – caused Gander to order only approximately $1-$2 million per week in inventory by October 2017 and the distribution center did not begin receiving this inventory until mid-October 2017. As a result, labor at the distribution center was cut back.

108.    According to FE2, when purchasing for the stores began in full, in late October/early November 2017, Gander was forced to order additional inventory in order to make up time. In November 2017, the distribution center was receiving $5-$10 million in inventory per week and this increased to $15-$20 million in inventory per week by December 2017. FE2, the VPs, management at the distribution center, and the inventory Directors, discussed at meetings throughout September to December 2017 the delays in ordering and shipping inventory to the distribution center and the fact that the distribution center was understaffed and ill equipped to handle the inventory shipments it was receiving.

109.    According to FE2, the distribution center did not have an inventory system that was able sufficiently to receive and process inventory beginning with the first deliveries in October 2017. Problems with the SKUs in the Camping World inventory system created a situation where inventory arrived but the SKUs for the inventory could not be found in the system or the SKUs did not match the inventory being received. As a result, says FE2, many of the first shipments of inventory that arrived to the distribution center in October 2017 were not being received in the inventory system and pallets of inventory were being piled in a staging area for troubled orders while

- 42 -

the problems with the orders were fixed, which could take weeks. FE2 relayed to the VPs the distribution center's problems with receiving inventory and the backlog it caused as the problems were occurring, multiple times a week, in October and November 2017.

110.    FE1 similarly reported that there were problems at the distribution center. According to FE1, there were not enough employees working at the distribution center to process the orders in time. FE1 also said that items were not properly set up in the Camping World inventory system.

111.    According to FE2, in October 2017, the problems at the distribution center caused problems with vendors as well. Because inventory was not being properly received in the inventory system when it was delivered to the distribution center, those at Gander responsible for paying vendors were not aware that the shipments were being delivered and vendors were not being paid for those shipments. In turn, vendors were refusing to ship additional inventory until the open purchase orders were paid. According to FE2, inventory managers were forced to call the distribution center and have them hunt down orders and enter them into the system as received so that vendors could be paid and new order shipped. According to FE2, this not only caused delays in the distribution center but it caused Gander to miss discounted payment terms, forcing Gander to pay full price on inventory shipments. FE2 discussed the issues with vendors caused by the distribution center with the VPs weekly at meetings and in informal discussions.

112.    According to FE3, in November 2017, he/she also experienced problems with the distribution center. The Camping World inventory system could not locate where inventory was located in the distribution center and could not forecast what inventory needed to be shipped to which stores without staff manually searching for the inventory in the system and inputting the information. FE3 also said that the Wi-Fi at the distribution center was so poor that the signal did not cover the entire facility and staff could not fill orders if they were outside the signal area. FE3

- 43 -

communicated these issues to the VPs at weekly meetings held with other Directors and through email communications.

113.    According to FE2, in November 2017, the distribution center was so backed up with deliveries there were trucks waiting at the distribution center to deliver merchandise.  At one point, approximately 100 pallets were backlogged at the distribution center and had not been entered into the inventory system as received.  In December 2017, before the Lakeville, Minnesota store opened, FE2 discussed the backlog of inventory at the distribution center with the VPs and Gander Regional Directors.  According to FE2, at these meetings the VPs were told that inventory shipments were sitting for weeks and were given a daily count of backlogged pallets.  FE2 said that the backlog of pallets had reached approximately 1,000 pallets by February 2018.

**Delays in Gander Store Openings**

114.    According to FE3, because of the issues with the inventory system and the distribution center, Gander stores were not being shipped inventory timely and store openings were delayed.

115.    According to FE3, early in October 2017, Lemonis visited Gander headquarters in Bloomington, Minnesota.  Lemonis was told that there were problems with getting product to the stores in time for opening.  FE3 and others communicated to Lemonis that they needed more time and the opening of the Lakeville, Minnesota store was pushed back.

116.    FE2 was also present when Lemonis visited Gander headquarters in early October 2017 and addressed Gander employees.  According to FE2, Gander Merchandising Directors asked Lemonis for more time to finalize inventory planning and were given an additional month by Lemonis.   According to FE2, this caused delays in purchasing inventory and in opening the Lakeville, Minnesota store.

- 44 -

117.     FE2 also said that during Lemonis' visit to Gander headquarters in October 2017, a director asked Lemonis about inventory spending and Lemonis told the employee not to worry about inventory spending but instead to fill the stores and make the stores look good.

118.     According to FE3, the Gander store in Lakeville, Minnesota, was scheduled to open around Thanksgiving but was delayed until December 2017.  Gander employees were told by Gander's VP of Operations that they needed to do whatever it took to open the Lakeville, Minnesota store.  Employees from Gander headquarters staffed the Lakeville store in early December 2017 in order to set the store up in time for its December 13, 2017 opening.[8]  According to FE3, Gander's VP of Operations told him/her that "Marcus [Lemonis] says we just have to do it."

119.     FE1 recalls that around Thanksgiving 2017, Camping World employees were flown in from different parts of the country to work at the distribution center to try and get the inventory shipped out for the opening of the Lakeville, Minnesota store.

120.     According to FE2, in November 2017, the manager of the distribution center discussed the need for more staffing at the distribution center with the VPs and Gander inventory directors during weekly meetings.  FE2 said that he/she and others from Gander headquarters, as well as Gander employees at stores local to the distribution center's Lebanon, Indiana location, worked at the distribution center in order to facilitate the opening of the Lakeville store in December 2017.

121.     According to FE2, when the Lakeville Gander store opened in December 2017, Gander used the inventory they had on hand at the distribution center to fill empty space so the store appeared full because they were not able to order, ship, and distribute the inventory merchandise that

---

[8]     The Gander store in Lakeville, Minnesota, was the first Gander store to re-open after Camping World purchased Gander Mountain from bankruptcy. *First Gander Outdoors to Open in Minnesota* (Dec. 12, 2017), https://sgbonline.com/first-gander-outdoors-to-open-in-minnesota/.

- 45 -

the store had planned to carry. FE2 said that the store was filled with duplicative products, products that were out of season, and whatever other inventory was available in the distribution center, including clearance Camping World merchandise. According to FE2, the VPs were aware of and approved this use of inventory to fill the store. In December 2017, prior to the Lakeville store opening, Gander VP of Merchandising told FE2 that the Lakeville store did not look full and instructed FE2 to ship more inventory to fill the store regardless of the inventory assortment plan for the store. For instance, FE2 recalled that Gander ordered an additional round of apparel, extra tackle boxes, additional shooting targets, additional camping tents, additional sleeping bags, and one extra pair of shoes of every size.[9] These inventory items were chosen in part because they were large items which could fill space in the store. According to FE2, the inventory budget for the Lakeville store was approximately $2.8 million but the store opened in December 2017 with approximately $3.8 million of inventory.

122. According to FE3, in December 2017 he/she also worked on the rollout of the Lakeville, Minnesota store and stated that the Lakeville store was rushed and not ready to open when it did. FE3 recalled that the store suffered from IT issues, including that the point-of-sale system was not recognizing merchandise or pricing.

123. According to FE1 and FE2, Lemonis was present at the opening of the Lakeville, Minnesota store on December 13, 2017.[10]

---

[9] The inventory described stands in stark contrast to Lemonis' statement on August 10, 2017 that "we will not carry the level of apparel and footwear that we historically have because we believe that, ***that is not as experiential. It's more of a commodity-based business. And we want to carry the types of products and services that require human interaction with an expert and/or some level of installation or something you need just in time. That is our defense mechanism against margin compression*** competing with Amazon-type retailers." Also set forth in ¶61.

[10] On December 13, 2017, Lemonis posted videos on his Twitter account (@marcuslemonis) of him at the Lakeville opening.

124.    FE1 stated that Lemonis arrived at the store on the afternoon of the opening and in a brief meeting at the front of the store with all store employees and members of the corporate office acknowledged that there were issues with the store but, according to FE1, said "let's just get the store open." According to FE1, Lemonis stayed in the Lakeville store for approximately 2-3 hours and saw the point-of-sale issues. FE1 stated that the issues with the point-of-sale system and pricing that Gander experienced at the Lakeville, Minnesota store continued through the opening of the next 10 to 12 Gander stores.

125.    According to FE3, beginning in December 2017 with the Lakeville store, Gander's newly opened stores were selling approximately 40% of forecasted sales. FE3 said that the Gander store sales figures were shared at weekly meetings he/she attended with all of the Gander Directors and the VPs. According to FE3, as additional Gander stores opened in 2018, the sales figures remained consistently below forecast.

126.    According to FE2, other stores that Gander and Lemonis had originally planned to open in 2017 also had their opening dates pushed back into 2018.

127.    FE1 explained that in the first part of 2018 the issues at the distribution center caused delays in many of the store openings. According to FE1, he/she, together with Gander's VP of Merchandising, Gander's VP of Operations, and other Gander managers, had facetime calls with Gander stores that were preparing to open. On those calls, the store managers walked aisle by aisle showing the lack of products on the shelves. FE1 stated that some of the stores with empty shelves were set to open in just days.

128.    FE3 also reported that Gander stores continued to be delayed during January 2018 and through the Spring of 2018. According to FE3, in February 2018 he/she did store walk-throughs for stores that were planning to open and found that these stores also lacked inventory. As a result, Gander had to push back the openings for these stores and FE3 had inventory shipped directly to the

- 47 -

stores. According to FE3, he/she had to obtain the approval of Gander's VP of Merchandising to perform the direct shipping.

## ADDITIONAL SCIENTER ALLEGATIONS

**Defendants Controlled the Company and Its Public Messaging**

129. Lemonis and Adams structured Camping World and the IPO to entrench their control over the Company's leadership, business, and operations, including its public statements. Lemonis and Adams had control over directors through their powers to designate directors and over executives, whom they had the power to appoint and terminate. The consolidated power structure of Camping World provided Lemonis and Adams with significant control over the Company's strategies, decisions, acquisitions, and messaging to the investing public.

130. Moreover, in their respective roles as CEO, CFO, COO, and Director, Lemonis, Wolfe, Moody, and Adams were able to, and did, determine the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Lemonis, Wolfe, and Adams signed the 2016 10-K and 2017 10-K. Lemonis, Wolfe, and Moody attended conference calls and spoke on behalf of the Company throughout the Class Period. Lemonis and Moody were quoted in Class Period releases alleged herein to be false and misleading and Wolfe signed the Form 8-Ks that were submitted to file those releases with the SEC.

131. Lemonis, Wolfe, Moody, and Adams participated in the drafting, preparation, and/or approval of such public statements and were provided with copies of the documents alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants were responsible for ensuring the accuracy of the public reports and releases detailed herein and for

- 48 -

verifying that the facts supported the statements and there were no material omissions, and they are therefore liable for the misrepresentations and omissions therein.

132.    During and prior to the Class Period, as senior executive officers and directors of Camping World, Lemonis, Wolfe, Moody, and Adams, were privy to confidential and proprietary information concerning Camping World and its operations, finances, financial condition, internal controls and present and future business prospects, including the integration, rollout, and financial performance of Gander stores.  Each of them also had access to internal corporate documents, conversations, and connections with corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to them in connection therewith.  Because of their possession of such information, each of them knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

**Insiders Sold Camping World Stock at Inflated Prices**

133.    Defendants had a massive informational advantage and were uniquely situated, due to their private ownership of the Company prior to taking it public, to gain enormous financial rewards by going public and portraying the Company in a positive light during the periods following the IPO. Camping World had been a private company for decades prior to 2016.  Defendants held significant stakes in Camping World but, because it was private, those stakes were largely illiquid, and the IPO created an opportunity for liquidity.  By listing Camping World Class A shares on a public exchange (the NYSE) but retaining voting control through Class B and Class C shares, defendants were able to control the Company while creating the opportunity to convert their ownership of Camping World into shares of Camping World Class A common stock, which could then be sold on the open market.

- 49 -

134.    On March 13, 2017, Camping World issued its false and misleading 2016 10-K. Defendants repeated substantially the same false and misleading statements in May and October 2017, concealing the Company's material weaknesses in internal controls and accounting errors. On May 1, 2017, Camping World announced the acquisition of Gander stores out of bankruptcy, and on May 8, 2017, Camping World announced that, "after reviewing the [Gander] stores in more detail since [Camping World's] success[ful] bid in the bankruptcy process, [Camping World's] current goal is to operate seventy or more, locations" that "have a clear path to profitability."

135.    Thereafter, as discussed above, defendants continued to make false and misleading statements regarding the integration and rollout of Gander stores.  *See* ¶¶58-69.

136.    Based on the overly rosy statements, Camping World's stock price  increased to $40 per share by October 10, 2017.  Soon thereafter, on October 31 and November 1, 2017, defendant Lemonis, through an entity controlled by him and Adams, sold over 800,000 shares of Camping World Class A stock at $40.50 per share for more than $32.4 million in gross insider sale proceeds. Then, on March 15, 2018 – just two weeks before the close of Camping World's disappointing 1Q18 – defendant Lemonis sold an additional 130,000 shares of Camping World Class A stock at $35.51 per share for more than $4.6 million in additional gross proceeds.

137.    In addition, defendant Wolfe, Camping World's CFO, sold over $9 million worth of Camping World Class A shares from April 26, 2017 to September 27, 2017 at prices as high as $40.34 per share.  Defendant Moody, Camping World's COO, sold over $16.8 million worth of Camping World Class A shares from April 26, 2017 to December 28, 2017 at prices as high as $46.17 per share.

138.    Non-defendant executives who were closely involved in the disclosures set forth herein also sold a significant amount of stock.  Namely, the President of Camping World, Roger Nuttall, sold over $13.8 million worth of Camping World Class A shares from June 26, 2017 to

- 50 -

December 27, 2017 at prices as high as $45.92 per share.[11]  Defendants also commenced two secondary public offerings, which, rather than focus primarily on raising more money to invest in the business, principally allowed insiders to personally take full advantage of the liquidity opportunity.

139.    Many of the insider sales occurred at prices above $40, near the Class Period high and more than double the $19.04 per share price the shares had fallen to at the end of the Class Period, and far above the around $15 per share the stock trades at today.

140.    In total, the Individual Defendants obtained more than $75 million in gross proceeds from their Class Period sales at inflated prices.

**Defendants Conducted Due Diligence Prior to
the Gander Acquisition and Closely Monitored
the Rollout**

141.    The Gander acquisition was the largest single transaction by Camping World since it became public.  Defendants were particularly aware of the negative impact that bad inventory integration and management from the Gander acquisition would have on Camping World's profit margins.  Defendant Lemonis, for example, has repeatedly advised business owners, on his television show *The Profit*, that good inventory management is one of the most important attributes of a successful business.  Defendant Lemonis has stated that "the best place to start at any business that is struggling, you should start with inventory," that "you better have tight inventory controls" and that "[b]ad inventory management and the wrong inventory are the two things that kill companies."[12]

---

[11]    Defendants Wolfe and Moody entered into Rule 10b5-1 trading plans during the middle of the Class Period and after the fraud had already begun.

[12]    Reportedly, in connection with *The Profit,* Lemonis has been sued by multiple small businesses owners who allege a range of misconduct on his part, including fraudulent inducement and unjust enrichment. *See Exclusive: 20 Business Owners Claim There's a Dark Side to Marcus Lemonis's Reality TV Show 'The Profit,'* Inc.com, https://www.inc.com/will-yakowicz/dark-side-of-marcus-lemonis-reality-tv-show-the-profit.html (last visited Feb. 23, 2019).

142.     Through the required due diligence prior to the acquisition of Gander, defendants knew or recklessly disregarded the incompatibility of Camping World's inventory and distribution systems with Gander's retail business, and the SKU and distribution difficulties that the acquisition would create in transitioning from low-volume, high-priced RV inventory, to high-volume, low-priced Gander inventory.  Moreover, defendants closely monitored and discussed during every earnings call the rollout of Gander stores.

143.     Camping World's SEC filings stated that, as part of its RV acquisition strategy, the Company would "exchange confidential operational and financial information, conduct due diligence inquiries, and consider the structure, terms, and conditions of the potential acquisition." The SEC filings relatedly noted that "[p]otential acquisition discussions frequently take place over a long period of time and involve difficult business integration and other issues."  Undoubtedly the same due diligence process would have been used for Gander.  Moreover, the Gander Mountain bankruptcy court's "Bidding Procedures" required that Camping World and Gander Mountain enter into a confidentiality agreement and that Gander Mountain provide Camping World "available due diligence access" and make available any "information as may be reasonably requested" by Camping World.  In turn, to submit a bid, Camping World was required to provide a statement that it "had an opportunity to conduct any and all due diligence regarding [Gander Mountain's] businesses and the Assets prior to submitting the bid."  Given the stark differences between Camping World's existing RV dealerships and Gander Mountain's large retail stores, any reasonable diligence by Camping World would have revealed the incompatibility of Camping World's inventory management and distribution systems and the inventory and distribution necessary to open and run Gander Mountain stores.

144.     As set forth in ¶¶43-48, 79-80 and 89-128, the Gander acquisition required moving thousands of new vendors and products to a new operating system that Camping World had not used,

- 52 -

which was time consuming and costly. In their duties as CEO and COO, Lemonis and Moody knew or recklessly disregarded this information learned in due diligence.

145.    As set forth in ¶¶58-62 and 64-68 above, Lemonis made clear in public statements that he and the other defendants were directly involved in and responsible for the selection of Gander stores. For example, just days after the public announcement of the Gander acquisition, Lemonis stated that he had "review[ed] the stores in more detail" and announced the plans for opening Gander stores.

146.    Lemonis reaffirmed his close involvement in the Gander integration when he also told analysts that "[Moody] and I have really been at the forefront of negotiating those leases" and that they had "elected to pass" on certain stores. Moreover, Lemonis personally posted on Twitter about the opening of Gander stores, including a May 4, 2017 tweet in which he stated: "I will update what stores will continue here over the next 30 days @GanderMtn – we will follow the path to saving jobs and profitability." Lemonis thereafter posted lists of stores to be reopened and responded to inquiries on Twitter about the stores selected.

147.    Defendants also closely monitored the integration and inventory management of the Gander rollout. For example, Lemonis said they were being "calculated and disciplined . . . in how we manage this business" and that they had "aggressively negotiated rents [and] diversified the mix of merchandise." Lemonis later admitted the integration was a "giant sh[**] show" and that he had personally witnessed this when he visited the distribution center. Defendants were particularly aware of the negative impact that bad inventory management would have on Camping World's profit margins because, in Lemonis' words, "[b]ad inventory management and the wrong inventory are the two things that kill companies."

148.    Lemonis admitted that he picked the store locations to open and then reviewed "daily reports" on the stores. For example, after the Class Period, when defendants closed a Gander

- 53 -

location in Florence, Alabama due to its lack of profitability, Lemonis admitted not only that he was directly involved in and responsible for the selection of Gander stores to reopen, but also that he monitored – in detail – the opening and performance of the Gander stores, stating:

> I think in that particular case, I take the blame for any location that we picked. Florence, Alabama looked like it had a clear path to profitability.[13] And after 4, 5 months of reviewing the daily reports, the foot traffic, all of the things, I wasn't satisfied with the rate that it was even moving at. And I did not want to burn another dollar for another day. . . .
>
> I am also closely monitoring other locations in a similar fashion that I managed, that I monitored Florence. We haven't made any conclusive decisions yet, but I'm not opposed to any of them. . . . So I would just say, it was my fault. I went back to a location out of the 160. I picked one that was wrong. It was my fault.

149. As set forth in ¶¶89-128 above, former employees have corroborated that defendants and/or those reporting to them were involved in and closely monitored the selection, integration, and rollout of Gander stores and were aware of the integration and rollout failures.

150. The divergence between the overly rosy assessment of integration in the false and misleading statements and the truth, as revealed at the end of the Class Period, further supports a strong inference of scienter. For example, defendants initially stated that they expected to open 15 to 20 Gander stores by the end of 2017. But, due to the rampant inventory and distribution issues, Camping World had opened just two Gander stores by the end of 2017. Also, during the August 10, 2017 earnings call, Lemonis estimated that it would cost approximately $20 million in pre-opening expenses to open 55 Gander stores. But, again due to the rampant inventory and distribution issues, Camping World had expended more than $25 million in pre-opening expenses by the end of 2017 alone, with just two stores open. By the time Camping World had opened approximately 55 Gander stores, the Company had spent over $61 million in pre-opening expenses, more than triple the initially reported $20 million. Camping World has yet to open the more than 70 Gander stores

---

[13] As explained by FE1, the Florence, Alabama location was a poor-performing Gander Mountain store and should not have been reopened.

- 54 -

defendants originally claimed, rather, Camping World has closed stores opened after only a few months despite promising to target the most profitable stores and inventory, and Lemonis admitted the Gander stores would result in $60 million in adjusted EBITDA losses in 2018. The divergence between what was happening and what defendants reported supports a strong inference of scienter, particularly given that Lemonis had repeatedly promised investors that "we only put numbers out there that we know we can hit," which further shows his direct monitoring of the factual details behind his public statements.

**Defendants' Reckless Disregard for Internal
Controls and Accurate Financial Reporting**

151.    As the senior executives and directors of a publicly traded company, the Individual Defendants knew the existence of any material weakness in the Company's internal controls or any defect in its disclosure controls would be material to public investors as it would immediately call into question the Company's accounting and financial statements. For example, the definition of a material weakness is a

> significant deficiency, or combination of significant deficiencies, that result[ed] in more than a remote likelihood that a material misstatement of the annual or interim financial statements w[ould] not be prevented or detected.

152.    As of March 8, 2017, Camping World suffered several material weaknesses in its internal controls, which resulted in the overstatement of EPS and net income by as much as 37%.

153.    Demonstrating their reckless disregard for the Company's controls, accounting, and financial reporting, defendants Lemonis and Wolfe signed certifications throughout the Class Period stating they had evaluated the Company's internal controls and procedures and that these controls and procedures were effective and that Camping World's financial reporting was accurate and free from fraud. Moreover, the 2016 10-K, 1Q17 10-Q, 2Q17 10-Q, and 3Q17 10-Q all stated that the Company's "management, with the participation of our Chief Executive Officer and Chief Financial

- 55 -

Officer, evaluated, as of the end of the period . . . the effectiveness of [Camping World's] disclosure controls and procedures."  And the 2016 10-K further stated that Camping World had dedicated "significant resources and management attention" to the Company's internal controls and procedures.

154.    Demonstrating further disregard, defendants were on notice that the Company lacked reliable accounting infrastructure and controls prior to March 8, 2017.  Specifically, the FY 2016 Release issued on that date stated that "[i]n connection with the preparation of the financial statements for the year ended December 31, 2016, errors were identified within the elimination of intercompany revenue, costs, operating expenses, and profit in ending inventory," which caused Camping World to revise certain fourth quarter 2015 financial results.

155.    All of the Individual Defendants had served as senior managers or directors of the Company prior to the IPO and had intimate familiarity with the Company's accounting policies, procedures, and controls and further developed this familiarity and knowledge in preparation for the IPO and in the first year thereafter.  As senior managers and directors of the Company prior to and after the IPO, all the Individual Defendants knew or recklessly disregarded the accounting errors described in the FY 2016 Release.  Notably, the error in "elimination of intercompany revenue" identified in the FY 2016 Release was substantially the same as the error in "elimination of intercompany allocation of certain revenue" identified in the FY 2017 Release a year later.

156.    In addition, several of the material weaknesses in the Company's internal controls arose from the FreedomRoads segment, which Lemonis had co-founded and run for more than a decade, which defendant Adams was the Chairman of for more than a decade, and which defendant Moody was an Executive Vice President of for nearly a decade.  Specifically, the Company admitted that "certain accounting policies and procedures related to corporate accounting functions within FreedomRoads . . . were not sufficiently documented and/or executed to be considered effective,"

- 56 -

"communication to those executing transactions and performing corporate review functions at FreedomRoads was not sufficiently performed to ensure internal control responsibilities were properly reinforced," and "information used by FreedomRoads to analyze trade-in inventory included inaccurate or incomplete data."

157.    The existence of prior accounting errors (and in particular prior errors similar to those ultimately disclosed), the Individual Defendants' long-standing experience with the Company and the segments that suffered the errors and weaknesses, the Individual Defendants' representations to the market, and the magnitude and scope of the errors, support a strong inference that the Individual Defendants knew or recklessly disregarded the true facts disclosed toward the end of the Class Period.

**Lemonis' Admissions Regarding His Disclosure Failures**

158.    Lemonis ran Camping World as a private company for years and was used to doing what he wanted without any disclosure obligations.  In order to partially cash out insiders, defendants  wanted access to the public markets, but without responsibility to investors.  That was clear from the structure of the IPO, which spread the economic risk but kept control tightly held.

159.    Moreover, on the May 8, 2018 conference call wherein defendants admitted certain negative facts that had been concealed, Lemonis reflected his indifference to whether the stock price fluctuated based on speculation from lack of disclosure, stating:

> I kind of didn't really care about anything other than making sure that I didn't break that plan and I didn't break make my people, and I didn't break the process or the customer experience.  And if the net result was that people speculated about the health of the company and drove the stock down and wrote all sorts of crazy things about what the company is doing, I kind of didn't really care because at the end of the day, I know this business better than anybody that will ever write about it, ever. And I know exactly what works and doesn't work.

160.    A month later, during a June 6, 2018 investor conference, Lemonis was more conciliatory and seemingly admitted that defendants had not provided the full and accurate disclosures to investors required of a public company, stating in pertinent part:

> [M]e and not the rest of the team have to do a better job of understanding the transition from private company to public company and understanding how to share that strategy.  Because I am used to holding all my cards so I can sucker punch my competitors.
>
> I realize now that I need to give you enough information so you understand why capital is being deployed, why things are being done, so that it doesn't create mistrust or it doesn't create confusion.  So I think that really falls on me to do a better job in that regard.

161.    Later in June 2018, defendant Lemonis conducted an interview with Jim Cramer, host of the "Mad Money" investment show on CNBC, and again admitted that, "in being a public company there was a big transition from being private, and I would say that I've really learned, made some rookie mistakes in how to communicate to the market."

162.    Defendant Lemonis' statements regarding his preference for secrecy further support a strong inference that it was his  conscious decisions, not lack of information, which caused the false and misleading statements.

## LOSS CAUSATION AND ECONOMIC LOSS

163.    As detailed herein, defendants' fraudulent scheme artificially inflated the Company's stock price by misrepresenting and concealing the true nature of the Company's operations, financial results, and business performance and prospects, and, in particular, the fact that the Gander stores selected for opening were not limited to the most profitable and best performing stores; the Gander integration and rollout had suffered significant setbacks and dysfunction resulting in substantially increased pre-opening costs, delays, and earnings losses; and the Company was suffering from a multitude of material weaknesses in its internal controls and disclosure controls, which were not operating effectively, resulting in the issuance of materially overstated financial results.

- 58 -

164.    Defendants' false and misleading statements and omissions, individually and collectively, concealed Camping World's true value, controls and infrastructure, and business prospects, resulting in the Company's stock price being artificially inflated until, as indicated herein, the relevant truth about the Company's financial and operational condition and future business prospects was revealed through leakage of information, materialization of risks, and a series of corrective disclosures.  While each of the defendants' misrepresentations and omissions were independently fraudulent, they all artificially inflated the Company's stock price and gave the market the false notion that the reopened Gander stores were selected based on historical performance and profitability, that the integration and rollout of the Gander stores was on track and going as planned with no negative impact on the Company's profits, that the Company's infrastructure and internal controls were sound and effective, and that the Company's historical financial results were accurate and prepared in accordance with GAAP.  These false and misleading statements and omissions, among others, prevented the market from learning the truth and kept the Company's stock price artificially inflated throughout the Class Period.

165.    Defendants' false and misleading statements and omissions caused, or were a substantial contributing cause of, the Company's stock trading at artificially inflated levels, reaching as high as $47.19 per share during the Class Period, on December 7, 2017.

166.    The truth began to emerge as information leaked into the market, the Company made a series of partial disclosures, and/or the risks began to materialize beginning on February 27, 2018 and continuing through the close of the market on August 8, 2018, causing substantial losses to investors.

167.    The chart below demonstrates the divergence of the Company's stock price from Standard & Poor's Composite Index  ("S&P Index") and the Company's identified peers' stock prices ("Peer Index") as the revelation of the truth became known.  While Camping World's stock

price fell approximately 55% on from the close of February 26, 2018 through August 8, 2016, the S&P Index and the Peer Index increased by 3.9% and 3.2%, respectively.



Camping World
vs Standard & Poor's Composite 500 Index and Peer Index
February 26, 2018 through August 8, 2018

168.     Indeed, starting in late February 2018, the truth about Camping World's true infrastructure, controls, and value began to leak out, materialize, and/or be revealed over the course of a series of disclosures.  The discussion of the following disclosures incorporates by reference the discussion of these events above.

169.     On February 27, 2018, the price of Camping World Class A common stock closed at $41.29 per share, a decline of $1.74 per share from the prior day's close.  After the close of trading, Camping World issued the FY 2017 Release disclosing that the Company suffered from unidentified material weaknesses in internal controls and that the Company's prior financial statements included accounting errors and overstatements of financial results.

170.     On March 1, 2018, the date by which Camping World was required to file its 2017 10-K, Camping World failed to file its 2017 10-K by market close.  Then, after market close on

- 60 -

March 1, 2018, the Company confirmed that it would be unable to timely file the 2017 10-K due to "material weaknesses in its internal control over financial reporting relating to the insufficient documentation of certain accounting policies and procedures within the Company's retail segment, and ineffective transactional level and management review controls over the valuation of used trade-in inventory," which "required the Company to perform additional procedures and analyses in connection with the Company's annual financial statement close process and preparation of the Form 10-K."

171. As a result of leakage of information regarding the Company's true internal controls, disclosure controls, and misstated financials, the materialization of the risk of such material weaknesses and ineffective controls, and the corrective disclosures described above, the price of Camping World Class A common stock declined from $43.03 per share on the close of February 26, 2018 to $38.40 on March 2, 2018. As the market continued to digest the information, the price of Camping World Class A common stock continued to decline on the next trading day, March 5, 2018, falling from $38.40 per share to $37.23 per share.

172. In total, from the close of February 26, 2018 through March 5, 2018, the price of Camping World Class A common stock declined by more than 13%, falling from $43.03 per share on the close of trading on February 26, 2018 to $37.23 per share on the close of trading on March 5, 2018, on abnormally high trading volume. The trading volume on each of the days between February 26, 2018 and March 5, 2018 was higher than the trading volume of any trading day in the previous four weeks.

173. Between the February and March disclosures set forth above and May 8, 2018, Camping World's stock price dropped from approximately $37 to $27 per share. But, despite the disclosures and stock price declines, the price of Camping World's Class A common stock remained artificially inflated due to defendants' continued false and misleading statements. In May and

August 2018, Camping World issued additional corrective disclosures revealing the true facts about Gander, and the Company's stock price declined as a result.

174.    On May 8, 2018, Camping World began to reveal the integration and rollout problems that caused the delayed Gander store openings and increased costs, including the inventory, distribution, and technological issues being confronted.  As a result, the price of Camping World Class A stock fell $4.60 per share, or 17%, on abnormally high trading volume to close at $23.02 per share on May 8, 2018, and analysts slashed their price targets.

175.    Then, on August 10, 2018, Camping World further revealed the Gander integration and rollout problems, and the financial impact thereof.  On this news, the price of Camping World Class A stock fell $3.17 per share, or 14%, on abnormally high trading volume to close at $19.04 per share on August 8, 2018, and analysts again slashed their price targets.

176.    From February 26, 2018, when Camping World Class A common stock closed at $43.03 per share, to August 8, 2018, when Camping World Class A common stock closed at $19.04 per share, Camping World Class A common stock declined by $23.99 per share, or 56%, owing to investors' incorporation of the information correcting defendants' prior false and misleading statements.  Since August 8, 2018, the price of Camping World stock has continued to decline, now trading at around $15 per share.

## PRESUMPTION OF RELIANCE

177.    At all relevant times, the market for Camping World Class A common stock was an efficient market for the following reasons, among others:

(a)    Camping World Class A common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

- 62 -

(b)      according to the Company's 2017 10-K, filed on March 13, 2018, the Company had more than 36.7 million shares of Class A stock outstanding as of March 12, 2018, demonstrating a very active and broad market for Camping World Class A common stock;

(c)      as a regulated issuer, Camping World filed periodic public reports with the SEC;

(d)      Camping World regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)      Camping World was followed by numerous securities analysts employed by major brokerage firms, such as Wells Fargo Securities, LLC, Credit Suisse, BMO Capital Markets, JPMorgan, and Stephens, Inc., who wrote reports that were distributed to the brokerage firms' sales forces and the public.

178.      As a result of the foregoing, the market for Camping World Class A common stock promptly digested current information regarding Camping World from publicly available sources and reflected such information in Camping World's Class A stock price.  Under these circumstances, a presumption of reliance applies to plaintiffs' purchases of Camping World Class A common stock.

179.      A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiffs' claims are based, in significant part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding Camping World's business and operations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them

- 63 -

important in making investment decisions. Given the importance of defendants' material omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

180. The false and misleading statements alleged herein were not forward looking and the safe harbor does not apply. To the extent any of the alleged false and misleading statements were forward looking, the federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply. Many of the specific statements alleged were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such cautions were absent from Camping World's Class Period filings and oral disclaimers.

181. Alternatively, to the extent that the statutory safe harbor could apply to any forward-looking statements pleaded herein, defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Camping World who knew that those statements were false or misleading when made.

182. Moreover, to the extent that defendants issued any disclosures designed to warn or caution investors of certain risks, those disclosures were also false and misleading since they did not disclose that defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures. For example, the 2016 10-K's purported warning that "*[i]f we fail to establish and maintain effective internal control over financial reporting and disclosure controls and procedures, we may not be*

- 64 -

*able to accurately report our financial results, or report them in a timely manner*" was materially false and misleading because the Company already suffered material weaknesses in its internal controls, its disclosure controls were ineffective, and as a result, the 2016 10-K was not accurate. Additionally, the 2017 10-K's purported warning of "*potential difficulties of integrating the business[] of Gander*" with Camping World's business, such as "*unanticipated issues in integrating suppliers, logistics, distribution, [and] retail operations*," was false and misleading because Camping World was already experiencing substantial difficulties in integrating Gander, including then-existing issues with logistics, distribution, and retail operations, which negatively impacted the Company's profit margins.

## COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Against Camping World and the Individual Defendants

183.    Plaintiffs incorporate the foregoing paragraphs by reference.

184.    During the Class Period, Camping World and the Individual Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

185.    These defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 65 -

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and other members of the Class in connection with their purchases of Camping World Class A common stock.

186.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their respective purchases of Camping World Class A common stock during the Class Period, because, in reliance on the integrity of the market, plaintiffs and other members of the Class paid artificially inflated prices for Camping World Class A common stock and experienced losses when the artificial inflation was released from Camping World Class A common stock as a result of the leakage and disclosure of information and price declines detailed herein.  Plaintiffs and other members of the Class would not have purchased Camping World Class A common stock at the prices paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' false and misleading statements.

187.     By virtue of the foregoing, Camping World and the Individual Defendants have each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants and the Crestview Defendants

188.     Plaintiffs incorporate the foregoing paragraphs by reference.

189.     The Individual Defendants and the Crestview Defendants acted as controlling persons of Camping World within the meaning of §20(a) of the Exchange Act.

190.     By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the

- 66 -

investing public, the Individual Defendants and the Crestview Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiffs contend are false and misleading. The Individual Defendants and the Crestview Defendants (either directly or through their two representatives on the Camping World Board) were provided with, or had unlimited access to copies of, the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

191. Lemonis and the Crestview Defendants further controlled Camping World by virtue of their share ownership, power to appoint directors, agreements with the Company, and historical and professional relationships with Camping World and the Individual Defendants. For example, the Company's 2017 10-K characterized Camping World as a "'controlled company,'" stating in pertinent part:

> Pursuant to the terms of the Voting Agreement, Marcus Lemonis, through his beneficial ownership of our shares directly or indirectly held by ML Acquisition and ML RV Group, and certain funds controlled by Crestview Partners II GP, L.P., in the aggregate, have more than 50% of the voting power for the election of directors, and, as a result, we are considered a "controlled company" for the purposes of the New York Stock Exchange (the "NYSE") listing requirements. As such, we qualify for, and rely on, exemptions from certain corporate governance requirements, including the requirements to have a majority of independent directors on our board of directors, an entirely independent nominating and corporate governance committee, an entirely independent compensation committee or to perform annual performance evaluation of the nominating and corporate governance and compensation committees.

192. As set forth above, Camping World violated §10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, the Individual Defendants and

1537028_1

the Crestview Defendants are liable pursuant to §20(a) of the Exchange Act for the §10(b) violations.  As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

## NON-FRAUD SECURITIES ACT CLAIMS

193.    The claims set forth below in Counts III through VII allege violations of §§11, 12(a)(2), and 15 of the Securities Act ("Securities Act Claims").  The Securities Act Claims are based solely on strict liability and negligence – *i.e.*, not on intentional or reckless conduct – and plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in connection with these non-fraud claims.  For purposes of the Securities Act Claims, plaintiffs repeat and re-allege the allegations from ¶¶13-16, 31-46, 49 and 73-128.

**Background to the Securities Act Claims**

194.    Following corporate scandals and the stock market crash of 1929, Congress passed the Securities Act to ensure accurate disclosures in connection with public offerings of securities. During the Class Period, Camping World completed two public offerings of Class A common stock – the May 2017 Offering and the October 2017 Offering.

195.    Under the Securities Act, Camping World, the individuals who signed the offering materials, and the underwriters to the offerings, are liable for material false or misleading statements or omissions in the offering documents.  As the SEC admonished Lemonis and Camping World in a letter on July 13, 2016, it would be "inappropriate to suggest that you are not responsible for the accuracy of the information you elect to include in your disclosure document."

196.    The offering materials issued in connection with the May 2017 Offering and the October 2017 Offering contained false and misleading statements, which misrepresented the true business and value of Camping World.  Defendants priced the May 2017 Offering at $27.75 per share and the October 2017 Offering at $40.50 per share.  As of the date of this filing, with the true facts about Camping World having been revealed, Camping World is trading at less than $15 per share, resulting in millions of dollars of investor losses.

- 69 -

197.     The Securities Act Claims seek to recover such losses suffered by lead plaintiff City of Pontiac General Employees' Retirement System, named plaintiff Plumbers & Steamfitters Local Union #486 Pension Fund, and all those similarly situated who purchased shares of Camping World Class A common stock pursuant to the false and misleading offering materials.

**Securities Act Claims Defendants**

198.     Defendants Camping World, Lemonis, Wolfe, Adams, Moody, and the Crestview Defendants (*see* ¶¶23-30) are re-alleged as defendants to the Securities Act Claims, which are also brought against current and former Camping World directors who signed the offering materials at issue and the underwriters of the offerings.

199.     Defendant Andris A. Baltins ("Baltins") has served as a director of Camping World since its formation in 2016.

200.     Defendant Brian P. Cassidy ("Cassidy") has served as a director of Camping World since its formation in 2016.

201.     Defendant Mary J. George ("George") has served as a director of Camping World since January 2017.

202.     Defendant Daniel G. Kilpatrick ("Kilpatrick") served as a director of Camping World from January 2017 to May 2018.

203.     Defendant Howard A. Kosick ("Kosick")  has served as a director of Camping World since October 2017.

204.     Defendant Jeffrey A. Marcus ("Marcus") has served as a director of Camping World since its formation in 2016.

205.     Defendant K. Dillon Schickli ("Schickli") has served as a director of Camping World since its formation in 2016.

- 70 -

206.    Defendants Lemonis, Wolfe, Adams, Baltins, Cassidy, George, Kilpatrick, Kosick, Marcus, and Schickli each personally or through power of attorney signed the May 2017 Registration Statement (defined below) issued in connection with the May 2017 Offering and are collectively referred to herein as the "May 2017 Offering Defendants."

207.    Defendant Lemonis, Wolfe, Adams, Baltins, Cassidy, George, Kilpatrick, Marcus, and Schickli each personally or through power of attorney signed the October 2017 Registration Statement (defined below) issued in connection with the October 2017 Offering and are collectively referred to herein as the "October 2017 Offering Defendants."

208.    Defendants Goldman Sachs & Co. LLC ("Goldman Sachs"), J.P. Morgan Securities LLC ("J.P. Morgan"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Robert W. Baird & Co. Incorporated ("Baird"), BMO Capital Markets Inc. ("BMO"), KeyBanc Capital Markets Inc. ("KeyBanc"), Stephens Inc. ("Stephens Inc."), and Wells Fargo Securities, LLC ("Wells Fargo") served as the underwriters for the May 2017 Offering and for the October 2017 Offering and are collectively referred to herein as the "Underwriter Defendants."

209.    The Underwriter Defendants received combined discounts and commissions of approximately $10.5 million in connection with the May 2017 Offering and combined discounts and commissions of approximately $8.1 million in connection with the October 2017 Offering.

**The May 2017 Registration Statement Was False
and Misleading**

210.    Camping World was taken public in October 2016 through an IPO of Class A common stock at $22 per share.  Then, in the May 2017 Offering, the Company and the Crestview Defendants sold nine million shares of Camping World Class A stock.  In total, after the Underwriter Defendants exercised their options to purchase 1.425 million additional shares, the Crestview

- 71 -

Defendants received more than $165 million, and the Company received more than $120 million, from the May 2017 Offering at inflated prices.

211. The May 2017 Offering was sold pursuant to a prospectus for a secondary offering of Camping World Class A shares filed with the SEC on Form 424B4 on May 26, 2017, which incorporated a registration statement for the offering filed on Form S-1 on March 29, 2017, and amended May 9 and 22, 2017 (collectively, "May 2017 Registration Statement"). The May 2017 Registration Statement expressly incorporated by reference the following documents filed with the SEC: the 2016 10-K, the 1Q17 10-Q, Camping World's Definitive Proxy Statement on Schedule 14A for full year 2016, and various Camping World filings on Form 8-K. Documents incorporated by reference are deemed to be part of the May 2017 Registration Statement.

212. The May 2017 Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation. Specifically, by incorporating the 2016 10-K and 1Q17 10-Q, the May 2017 Registration Statement included the same *Overstated EPS and Net Income Statements* as in ¶50; the same *Disclosure Control Statement* and *Internal Controls Statement* as in ¶51; the same *Signed Certification Statements* by defendants Lemonis and Wolfe as in ¶51; and the same *Compliance with GAAP Statement* as in ¶51.

213. The statements set forth in ¶212 were materially false and misleading for the following reasons:

(a) As of March 8, 2017 and continuing thereafter, the Company's internal controls and disclosure controls were not effective but in fact suffered from several material weaknesses, including: (i) deficient tax controls; (ii) inadequate accounting policies and procedures in the FreedomRoads reporting segment; (iii) ineffective transaction-level and management review

- 72 -

controls over the valuation of trade-in unit inventory; and (iv) insufficient documentation of certain accounting policies and procedures within the retail segment;

(b)     As of March 8, 2017 and continuing thereafter, the Company's internal controls were not effective and the Company suffered material weaknesses that resulted in Camping World having failed to properly: (i) defer a portion of roadside assistance policies; (ii) apply vendor rebates against related inventory balances; (iii) allocate intercompany revenue from new and used vehicles to consumer services and plans; and (iv) allocate intercompany markup costs applicable to new and used vehicles;

(c)     The Company's historical financial results reported in the 2016 10-K had not been prepared and reported in accordance with GAAP; and

(d)     As a result of the numerous errors, misstatements, and material weaknesses listed in (a)-(c) above, the Company's financial statements included in the 2016 10-K could not be relied on and its reported financial results were materially overstated, including: (i) basic earnings per share for the period from October 6, 2016 to December 31, 2016 was only $0.08 per share, rather than the $0.11 represented, an overstatement of more than 37%; (ii) diluted earnings per share for the period from October 6, 2016 to December 31, 2016 was only $0.07 per share, rather than the $0.09 represented, an overstatement of more than 28%; (iii) total net income for the three months ending December 31, 2016 was only $11.53 million, rather than the $13.6 million represented, an overstatement of more than 18%; and (iv) net income attributable to Camping World, and excluding non-controlling interests, for the three months ending December 31, 2016 was only $1.59 million, rather than the $2.06 million represented, an overstatement of more than 29%.

214.    As set forth in ¶¶74-78 above, Camping World confirmed that the May 2017 Registration Statement contained materially false and misleading statements through a series of disclosures correcting the financial information and admitting material weaknesses in its internal

- 73 -

controls. Between the May 2017 Offering and the date of this filing, the price of Camping World Class A common stock has declined by more than 40%.

**The October 2017 Registration Statement Was**
**False and Misleading**

215. Only five months after the May 2017 Offering, with the stock trading at around Class Period highs of more than $40 per share, Camping World – along with the October 2017 Offering Defendants and the Underwriter Defendants – conducted the October 2017 Offering to allow the Crestview Defendants to sell 6.7 million shares of Camping World Class A common stock. In total, after the Underwriter Defendants exercised their options to purchase an additional 1.005 million shares, the Crestview Defendants received more than $300 million from the October 2017 Offering at inflated prices.

216. The October 2017 Offering was sold pursuant to a prospectus for a secondary offering of Camping World Class A shares filed with the SEC on Form 424B4 on October 27, 2017, which incorporated a registration statement for the offering filed on Form S-1 on October 23, 2017, and amended on October 25, 2017 (collectively, "October 2017 Registration Statement"). The October 2017 Registration Statement expressly incorporated by reference the following documents filed with the SEC: the 2016 10-K, the 1Q17 10-Q, the 2Q17 10-Q, Camping World's Definitive Proxy Statement on Schedule 14A for full year 2016, and various Camping World filings on Form 8-K. Documents incorporated by reference are deemed to be part of the October 2017 Registration Statement.

217. The October 2017 Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation. Specifically, by

- 74 -

incorporating the 2016 10-K, 1Q17 10-Q, and 2Q17 10-Q, the October 2017 Registration Statement contained the following statements:

(a)     The October 2017 Registration Statement included the same **_Overstated EPS and Net Income Statements_** as in ¶50; the same **_Disclosure Control Statement_** and **_Internal Controls Statement_** as in ¶51; the same **_Signed Certification Statements_** by defendants Lemonis and Wolfe as in ¶51; and the same **_Compliance with GAAP Statement_** as in ¶51; and

(b)     The October 2017 Registration Statement purported to warn of "**_potential difficulties of combining the business[] of Gander_**" with Camping World's business, such as "**_unanticipated issues in integrating suppliers, logistics, distribution, [and] retail operations_**."

218.    The statements set forth in ¶217 were materially false and misleading for the following reasons:

(a)     As of March 8, 2017 and continuing thereafter, the Company's internal controls and disclosure controls were not effective but in fact suffered from several material weaknesses, including: (i) deficient tax controls; (ii) inadequate accounting policies and procedures in the FreedomRoads reporting segment; (iii) ineffective transaction-level and management review controls over the valuation of trade-in unit inventory; and (iv) insufficient documentation of certain accounting policies and procedures within the retail segment;

(b)     As of March 8, 2017 and continuing thereafter, the Company's internal controls were not effective and the Company suffered material weaknesses that resulted in Camping World having failed to properly: (i) defer a portion of roadside assistance policies; (ii) apply vendor rebates against related inventory balances; (iii) allocate intercompany revenue from new and used vehicles to consumer services and plans; and (iv) allocate intercompany markup costs applicable to new and used vehicles;

(c)     The Company's historical financial results reported in the 2016 Form 10-K had not been prepared and reported in accordance with GAAP;

(d)     As a result of the numerous errors, misstatements, and material weaknesses listed in (a)-(c) above, the Company's financial statements included in the 2016 Form 10-K could not be relied on and its reported financial results were materially overstated, including: (i) basic earnings per share for the period from October 6, 2016 to December 31, 2016 was only $0.08 per share, rather than the $0.11 represented, an overstatement of more than 37%; (ii) diluted earnings per share for the period from October 6, 2016 to December 31, 2016 was only $0.07 per share, rather than the $0.09 represented, an overstatement of more than 28%; (iii) total net income for the three months ending December 31, 2016 was only $11.53 million, rather than the $13.6 million represented, an overstatement of more than 18%; and (iv) net income attributable to Camping World, and excluding non-controlling interests, for the three months ending December 31, 2016 was only $1.59 million, rather than the $2.06 million represented, an overstatement of more than 29%; and

(e)     Camping World had already experienced substantial difficulties in "integrating the business of Gander," including material negative events that occurred during the integration of Gander inventory into Camping World's systems due to inventory, distribution, and technological incompatibility, which required the manual entry of SKUs, the loss of SKUs during the process of uploading into the inventory system, SKUs becoming uncoupled from the products they were supposed to identify, an understaffed distribution center, difficulties in receiving inventory at the distribution center, lost inventory, and inventory backlogs, resulting in delayed inventory orders, delayed opening of stores, loss of price concessions, and increased pre-opening store costs.

**The October 2017 Registration Statement**
**Violated Item 303**

219.    In addition to the misstatements and omissions set forth above, the October 2017

Registration Statement was false and misleading because it failed to disclose material information

that was required to be disclosed pursuant to the regulations governing its preparation.

220.    Specifically, Item 303 required the October 2017 Registration Statement to describe

"any known trends or uncertainties that have had or that the registrant reasonably expects will have a

material favorable or unfavorable impact on net sales or revenues or income from continuing

operations." *See* ¶¶70-71.  Item 303 also required the October 2017 Registration Statement to

disclose events that would "cause a material change in the relationship between costs and revenues"

and "any unusual or infrequent events or transactions or any significant economic changes that

materially affected the amount of reported income from continuing operations and, in each case,

indicate the extent to which income was so affected."

221.    In negligent violation of these disclosure obligations, the October 2017 Registration

Statement failed to disclose known material trends, events, and uncertainties known to management

that were reasonably expected to have a material adverse effect on the Company's resources and

results of operations, including:

(a)    The Company had decided to rush to open Gander stores that historically were

not among the highly profitable and high-performing stores prior to Gander's bankruptcy, and, in

some cases, were among the historically worst-performing Gander stores;

(b)    The Company's decision to liquidate all Gander inventory delayed the

opening of stores, as the Company needed to acquire sufficient inventory to stock the stores and the

difficulty of stocking inventory was compounded by the fact that Camping World utilized its

existing distribution practices and technology for inventory management (*e.g.*, SKUs), which were

- 77 -

geared toward large, single items, like RVs, and not toward Gander's high volume, smaller products, all of which was increasing the costs of opening the Gander stores;

(c)     Camping World was facing material negative events that occurred during the integration of Gander inventory into Camping World's systems due to inventory, distribution, and technological incompatibility, which required the manual entry of SKUs, the loss of SKUs during the process of uploading into the inventory system, SKUs becoming uncoupled from the products they were supposed to identify, an understaffed distribution center, difficulties in receiving inventory at the distribution center, lost inventory, and inventory backlogs, resulting in delayed inventory orders, delayed opening of stores, loss of price concessions, and increased pre-opening store costs; and

(d)     The events described in subparagraphs (a)-(c) above each negatively impacted the Company's profit margins and results of operations.

222.    As set forth in ¶¶74-78 above, Camping World confirmed that the October 2017 Registration Statement contained materially false and misleading statements and omitted to disclose known trends and uncertainties that were reasonably expected to have a material adverse effect on the Company's resources and results of operations through a series of disclosures correcting the financial information, admitting material weaknesses in its internal controls, and admitting that the integration and rollout of Gander stores had been a disaster and severely impacted the Company's results of operations.

223.    Between the October 2017 Offering and the date of this filing, the price of Camping World Class A common stock declined by more than 60%.

## COUNT III

**For Violation of §11 of the Securities Act
Against Camping World, the May 2017 Offering Defendants,
and the Underwriter Defendants**

224.    Plaintiffs incorporate ¶¶193-223 by reference.

225.    The May 2017 Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

226.    Camping World is the registrant for the shares of Camping World Class A common stock, and as such is strictly liable for the false and misleading statements in the May 2017 Registration Statement.  The Underwriter Defendants, who served as underwriters to the May 2017 Offering, and the May 2017 Offering Defendants, who signed the May 2017 Registration Statement, were responsible for the contents and dissemination of the May 2017 Registration Statement.

227.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the May 2017 Registration Statement were true and without omissions of any material facts and were not misleading.

228.    By reasons of the conduct alleged, each of the defendants named herein violated §11 of the Securities Act.

229.    Lead plaintiff City of Pontiac General Employees' Retirement System purchased shares of Camping World Class A common stock in the May 2017 Offering and pursuant to the May 2017 Registration Statement.  At the time City of Pontiac General Employees' Retirement System purchased those shares, it and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

230.     City of Pontiac General Employees' Retirement System and members of the Class have sustained damages.  The value of the shares of the Camping World Class A common stock has declined substantially subsequent to and due to defendants' violations.

## COUNT IV

**For Violation of §12(a)(2) of the Securities Act
Against Camping World, the May 2017 Offering Defendants,
the Crestview Defendants, and the Underwriter Defendants**

231.     Plaintiffs incorporate ¶¶193-230 by reference.

232.     Camping World, the May 2017 Offering Defendants, the Crestview Defendants, and the Underwriter Defendants were sellers and offerors and/or solicitors of purchasers of the shares of the Camping World Class A common stock offered pursuant to the May 2017 Registration Statement and were motivated by a desire to serve their own financial interests or those of Camping World.

233.     The May 2017 Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.  Camping World's, the May 2017 Offering Defendants', the Crestview Defendants', and the Underwriter Defendants' actions of solicitation included participating in the preparation of the false and misleading May 2017 Registration Statement and participating in marketing the shares of the Camping World Class A common stock to investors.

234.     Camping World, the May 2017 Offering Defendants, the Crestview Defendants, and the Underwriter Defendants owed to the purchasers of Camping World Class A common stock, including lead plaintiff City of Pontiac General Employees' Retirement System and other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the May 2017 Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained

- 80 -

therein not misleading. These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the May 2017 Registration Statement as set forth above.

235. Lead plaintiff City of Pontiac General Employees' Retirement System and other members of the Class purchased shares of Camping World Class A common stock pursuant to the defective May 2017 Registration Statement. City of Pontiac General Employees' Retirement System did not know, nor in the exercise of reasonable diligence could have known, of the inaccuracies and omissions contained in the May 2017 Registration Statement.

236. By reason of the conduct alleged herein, the defendants named herein violated §12(a)(2) of the Securities Act. Accordingly, members of the Class who hold shares of Class A common stock have the right to rescind and recover the consideration paid for their shares and hereby elect to rescind and tender those shares to the defendants sued herein, and Class members who have sold their shares of the Class A common stock are entitled to rescissory damages.

**COUNT V**

**For Violation of §11 of the Securities Act
Against Camping World, the October 2017 Offering Defendants,
and the Underwriter Defendants**

237. Plaintiffs incorporate ¶¶193-236 by reference.

238. The October 2017 Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

239. Camping World is the registrant for the shares of Camping World Class A common stock, and as such is strictly liable for the false and misleading statements in the October 2017 Registration Statement. The Underwriter Defendants, who served as underwriters to the October 2017 Offering, and the October 2017 Offering Defendants, who signed the October 2017

- 81 -

Registration Statement, were responsible for the contents and dissemination of the October 2017 Registration Statement.

240.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the October 2017 Registration Statement were true and without omissions of any material facts and were not misleading.

241.    By reasons of the conduct alleged, each of the defendants named herein violated §11 of the Securities Act.

242.    Named plaintiff Plumbers & Steamfitters Local Union #486 Pension Fund purchased shares of Camping World Class A common stock in the October 2017 Offering and pursuant to the October 2017 Registration Statement.  At the time Plumbers & Steamfitters Local Union #486 Pension Fund purchased those shares, it and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

243.    Plumbers & Steamfitters Local Union #486 Pension Fund and members of the Class have sustained damages.  The value of the shares of the Camping World Class A common stock has declined substantially subsequent to and due to defendants' violations.

## COUNT VI

### For Violation of §12(a)(2) of the Securities Act
### Against Camping World, the October 2017 Offering Defendants,
### the Crestview Defendants, and the Underwriter Defendants

244.    Plaintiffs incorporate ¶¶193-243 by reference.

245.    Camping World, the October 2017 Offering Defendants, the Crestview Defendants, and the Underwriter Defendants were sellers and offerors and/or solicitors of purchasers of the shares of the Camping World Class A common stock offered pursuant to the October 2017 Registration Statement and were motivated by a desire to serve their own financial interests or those of Camping World.

- 82 -

246.     The October 2017 Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.  Camping World's, the October 2017 Offering Defendants', the Crestview Defendants', and the Underwriter Defendants' actions of solicitation included participating in the preparation of the false and misleading October 2017 Registration Statement and participating in marketing the shares of the Camping World Class A common stock to investors.

247.     Camping World, the October 2017 Offering Defendants, the Crestview Defendants, and the Underwriter Defendants owed to the purchasers of Camping World Class A common stock, including named plaintiff Plumbers & Steamfitters Local Union #486 Pension Fund and other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the October 2017 Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the October 2017 Registration Statement as set forth above.

248.     Named plaintiff Plumbers & Steamfitters Local Union #486 Pension Fund and other members of the Class purchased shares of Camping World Class A common stock pursuant to the defective October 2017 Registration Statement.  Plumbers & Steamfitters Local Union #486 Pension Fund did not know, nor in the exercise of reasonable diligence could have known, of the inaccuracies and omissions contained in the October 2017 Registration Statement.

249.     By reason of the conduct alleged herein, the defendants named herein violated §12(a)(2) of the Securities Act.  Accordingly, members of the Class who hold shares of Class A common stock have the right to rescind and recover the consideration paid for their shares and

- 83 -

hereby elect to rescind and tender those shares to the defendants sued herein, and Class members who have sold their shares of the Class A common stock are entitled to rescissory damages.

## COUNT VII

### For Violation of §15 of the Securities Act
### Against the Individual Defendants and the Crestview Defendants

250.    Plaintiffs incorporate ¶¶193-249 by reference.

251.    Each of the Individual Defendants and the Crestview Defendants acted as controlling persons of Camping World within the meaning of §15 of the Securities Act by virtue of his or its position as a director, senior officer, and/or controlling shareholder. By reason of their positions at the Company, the Individual Defendants and the Crestview Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised such power to cause Camping World to engage in the conduct alleged herein.

252.    The Crestview Defendants controlled Camping World by virtue of their majority share ownership, power to appoint directors, agreements with the Company, and historical and professional relationships with Camping World and the Individual Defendants as specified herein. For example, the Company's 2017 10-K characterized Camping World as a "'controlled company,'" stating in pertinent part:

> Pursuant to the terms of the Voting Agreement, Marcus Lemonis, through his beneficial ownership of our shares directly or indirectly held by ML Acquisition and ML RV Group, and certain funds controlled by Crestview Partners II GP, L.P., in the aggregate, have more than 50% of the voting power for the election of directors, and, as a result, we are considered a "controlled company" for the purposes of the New York Stock Exchange (the "NYSE") listing requirements. As such, we qualify for, and rely on, exemptions from certain corporate governance requirements, including the requirements to have a majority of independent directors on our board of directors, an entirely independent nominating and corporate governance committee, an entirely independent compensation committee or to perform annual performance evaluation of the nominating and corporate governance and compensation committees.

- 84 -

253. By reason of the foregoing, the defendants named herein are liable pursuant to §15 of the Securities Act.

254. Each of the Individual Defendants and the Crestview Defendants either signed the May 2017 Registration Statement and/or the October 2017 Registration Statement and/or otherwise participated in the process which allowed the sale of the shares of Camping World Class A common stock to be successfully completed.

255. Camping World violated §§11 and 12(a)(2) of the Securities Act in connection with the May 2017 Offering and the October 2017 Offering, as alleged in this complaint. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, the Individual Defendants and the Crestview Defendants are liable pursuant to §15 of the Securities Act for the §§11 and 12 violations.

## CLASS ACTION ALLEGATIONS

256. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of Camping World Class A common stock during the Class Period, including all persons who purchased Camping World Class A common stock in the May 2017 Offering and/or the October 2017 Offering, and were damaged thereby. Excluded from the Class are: (i) defendants; (ii) members of the immediate family of any defendant who is an individual; (iii) any person who was an officer or director of the Company during the Class Period; (iv) any firm, trust, corporation, or other entity in which any defendant has or had a controlling interest; (v) the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

1537028_1

257.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Camping World Class A common stock was actively traded on the NYSE.  According to the Company's 2017 10-K, the Company had more than 36.7 million shares of Class A stock outstanding as of March 12, 2018.  There are likely hundreds or thousands of members in the proposed Class.  While the exact number of Class members can only be determined by appropriate discovery, plaintiffs believe that Class members number at least in the hundreds, if not thousands, and that they are geographically dispersed.

258.    Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs' and all the Class members' damages arise from and were caused by the same representations and omissions made by or chargeable to defendants.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

259.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

260.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    Whether statements made by or chargeable to defendants during the Class Period misrepresented or omitted material facts;

(c)    Whether the price of Camping World Class A common stock was artificially inflated during the Class Period; and

(d)    To what extent the members of the Class have sustained damages and the proper measure of damages.

- 86 -

261.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for members of the Class to individually redress the wrongs done to them.  Plaintiffs are not aware of any difficulty in the management of this action as a class action.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure and certifying plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP as Class Counsel;

B.     Awarding compensatory damages in favor of plaintiffs and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiffs and other member of the Class recission or rescissory measure of damages;

D.     Awarding plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

E.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: February 27, 2019

ROBBINS GELLER RUDMAN & DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)
BRIAN E. COCHRAN (IL Bar # 6329016)
FRANK A. RICHTER (IL Bar # 6310011)
MATTHEW J. LANGLEY (*pro hac vice*)
DOMINIC C. LoVERDE (IL Bar # 6324263)

*s/ James E. Barz*

JAMES E. BARZ

200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com
bcochran@rgrdlaw.com
frichter@rgrdlaw.com
mlangley@rgrdlaw.com
dloverde@rgrdlaw.com

*Counsel for the City of Pontiac General Employees' Retirement System, Oklahoma Police Pension & Retirement System, and Plumbers & Steamfitters Local Union #486 Pension Fund and Lead Counsel for the Class*

DATED: February 27, 2019

LABATON SUCHAROW LLP
THOMAS A. DUBBS (*pro hac vice*)
MICHAEL P. CANTY (*pro hac vice* pending)
THOMAS G. HOFFMAN, JR. (*pro hac vice*)
MARISA N. DEMATO (*pro hac vice* pending)

THOMAS G. HOFFMAN, JR.

- 88 -

140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
tdubbs@labaton.com
mcanty@labaton.com
thoffman@labaton.com
mdemato@labaton.com

*Counsel for the City of Omaha Police & Fire
Retirement System and Lead Counsel for the
Class*

SULLIVAN, WARD, ASHER & PATTON, P.C.
CYNTHIA J. BILLINGS-DUNN
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48075
Telephone: 248/746-0700
248/746-2760 (fax)

*Additional Counsel for the City of Pontiac
General Employees' Retirement System*

- 89 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

PLUMBERS & STEAMFITTERS LOCAL UNION #486 PENSION FUND ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _25_ day of February, 2019.

PLUMBERS & STEAMFITTERS LOCAL
UNION #486 PENSION FUND

By: _/s/ signature_

Its: _ADMINISTRATIVE Agent_

CAMPING WORLD

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 10/12/2017 | 174 | $41.02 |
| 10/12/2017 | 185 | $41.70 |
| 10/13/2017 | 881 | $41.77 |
| 10/16/2017 | 159 | $41.64 |
| 10/17/2017 | 413 | $42.84 |
| 10/18/2017 | 663 | $43.63 |
| 10/19/2017 | 95 | $43.52 |
| 10/26/2017 | 283 | $39.43 |
| 10/26/2017 | 619 | $39.97 |
| 12/18/2017 | 121 | $45.00 |

Adjustment factors applied to all prices to reflect the special cash dividends.
The adjustments used are as follow:
0.996147 adjustment on 09/13/2018
0.996928 adjustment on 06/14/2018
0.998183 adjustment on 03/15/2018
0.99841 adjustment on 12/14/2017
0.997171 adjustment on 12/14/2017
0.998134 adjustment on 09/14/2017
0.997529 adjustment on 06/14/2017
0.997789 adjustment on 03/15/2017

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF PONTIAC GENERAL EMPLOYEES' RETIREMENT SYSTEM ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.   Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.  (a)   Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Hussey v. Ruckus Wireless, Inc., et al.*, No. 3:16-cv-2991 (N.D. Cal.).

(b)   Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Huang v. Depomed, Inc., et al.*, No. 3:17-cv-04830 (N.D. Cal.).
*Rodak v. D'Ambra, et al.*, No. 1:17-cv-01179 (N.D.N.Y.).

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

CAMPING WORLD

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___1st___ day of ___November___, 2018.

CITY OF PONTIAC GENERAL
EMPLOYEES' RETIREMENT SYSTEM

By: _Walter Moore_____
Walter Moore, Chairman

CAMPING WORLD

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 05/25/2017 | 963 | $27.27 |
| 05/25/2017 | 1,060 | $27.22 |
| 12/21/2017 | 667 | $45.57 |
| 12/21/2017 | 1,722 | $45.91 |
| 12/22/2017 | 2,290 | $45.83 |
| 12/29/2017 | 859 | $44.70 |
| 03/02/2018 | 1,614 | $36.17 |
| 03/05/2018 | 678 | $37.06 |
| 06/08/2018 | 2,004 | $23.99 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 08/17/2017 | 223 | $34.51 |
| 08/17/2017 | 569 | $34.63 |
| 10/05/2017 | 461 | $39.22 |
| 11/15/2017 | 856 | $41.27 |
| 04/11/2018 | 513 | $28.13 |
| 04/12/2018 | 720 | $28.15 |
| 05/15/2018 | 1,804 | $21.20 |

*Opening position of 3,123 shares.

Adjustment factors applied to all prices to reflect the special cash dividends.
The adjustments used are as follow:
0.996147 adjustment on 09/13/2018
0.996928 adjustment on 06/14/2018
0.998183 adjustment on 03/15/2018
0.99841 adjustment on 12/14/2017
0.997171 adjustment on 12/14/2017
0.998134 adjustment on 09/14/2017
0.997529 adjustment on 06/14/2017
0.997789 adjustment on 03/15/2017

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

OKLAHOMA POLICE PENSION & RETIREMENT SYSTEM ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.  (a)  Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Buehring v. Tempur Sealy Int'l, Inc., et al.*, No. 1:17-cv-02169 (S.D.N.Y.)
*Milbeck v. TrueCar, Inc., et al.*, No. 2:18-cv-02612 (C.D. Cal.)

(b)  Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Oklahoma Police Pension and Retirement System v. Nevro Corp., et al.*, No. 3:18-cv-05181 (N.D. Cal.)

(c)  Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Ho v. Flotek industries, Inc., et al.*, No. 4:15-cv-03327 (S.D. Tex.)
*Makhlouf v. Tailored Brands, Inc.*, No. 4:16-cv-00838 (S.D. Tex.)
*McKenna v. Dick's Sporting Goods, Inc., et al.*, No. 1:17-cv-03680 (S.D.N.Y.)
*Hessefort v. Super Micro Computer, Inc., et al.*, No. 3:18-cv-00838 (N.D. Cal.)

CAMPING WORLD

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25 day of Oct. , 2018.

OKLAHOMA POLICE PENSION & RETIREMENT SYSTEM

By: _____

Ginger Sigler, Executive Director

- 2 -

CAMPING WORLD

# SCHEDULE A

## SECURITIES TRANSACTIONS

Stock

| Date<br>Acquired | Amount of<br>Shares Acquired | Price* |
|---|---|---|
| 03/23/2018 | 3,796 | $31.76 |
| 03/26/2018 | 10,874 | $31.29 |
| 04/12/2018 | 2,098 | $27.94 |
| 04/12/2018 | 3,242 | $28.25 |
| 04/19/2018 | 1,008 | $27.98 |
| 04/19/2018 | 3,025 | $27.98 |
| 05/02/2018 | 4,351 | $28.75 |
| 05/18/2018 | 1,036 | $21.85 |
| 05/18/2018 | 8,580 | $21.90 |

*Adjustment factors applied to all prices to reflect the special cash dividends.
The adjustments used are as follow:
0.996147 adjustment on 09/13/2018
0.996928 adjustment on 06/14/2018
0.998183 adjustment on 03/15/2018
0.99841 adjustment on 12/14/2017
0.997171 adjustment on 12/14/2017
0.998134 adjustment on 09/14/2017
0.997529 adjustment on 06/14/2017
0.997789 adjustment on 03/15/2017

## CERTIFICATION

I, James Sklenar, as Chairman of City of Omaha Police & Fire Retirement System ("Omaha Police and Fire"), hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of Omaha Police and Fire. I have reviewed a complaint filed against Camping World Holdings, Inc. ("Camping World") alleging violations of the federal securities laws;

2.    Omaha Police and Fire did not purchase Class A common stock of Camping World at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.    Omaha Police and Fire is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.    Omaha Police and Fire's transactions in Camping World Class A common stock during the Class Period are reflected in Exhibit A, attached hereto;

5.    Omaha Police and Fire sought to serve as a lead plaintiff in the following class actions filed under the federal securities laws during the last three years:

*Robb v. FitBit Inc.*, No. 16-CV-0151 (N.D. Cal.)
*Hirtenstein v. Cempra, Inc.* No. 16-CV-1303 (M.D.N.C.)

6.    Beyond its pro rata share of any recovery, Omaha Police and Fire will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this ___16th___ day of December, 2018.

_____

James Sklenar
Chairman
*City of Omaha Police and Fire Retirement System*

## EXHIBIT A

## TRANSACTIONS IN CAMPING WORLD INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 12/21/17 | 1,854 | $45.98 | ($85,238.58) |
| Purchase | 12/21/17 | 4,782 | $46.32 | ($221,496.02) |
| Purchase | 12/22/17 | 6,361 | $46.23 | ($294,065.21) |
| Purchase | 12/29/17 | 2,385 | $45.10 | ($107,557.30) |
| Purchase | 03/02/18 | 4,482 | $36.48 | ($163,522.63) |
| Purchase | 03/05/18 | 1,885 | $37.39 | ($70,477.70) |
| Purchase | 06/08/18 | 5,568 | $24.15 | ($134,486.13) |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on February 27, 2019, I authorized the

electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will

send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List,

and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to

the non-CM/ECF participants indicated on the attached Manual Notice List.

*s/ James E. Barz*
JAMES E. BARZ

ROBBINS GELLER RUDMAN
  & DOWD LLP
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
E-mail:  jbarz@rgrdlaw.com

# Mailing Information for a Case 1:18-cv-07030 Ronge v. Camping World Holdings, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **James E Barz**
  jbarz@rgrdlaw.com,mburch@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Andrew B. Clubok**
  andrew.clubok@lw.com,andrew-clubok-9012@ecf.pacerpro.com,washington-dc-litigation-services-5378@ecf.pacerpro.com,DCECFNotificationsDC@lw.com

- **Brian E. Cochran**
  BCochran@rgrdlaw.com

- **Peter E. Cooper**
  pcooper@lawrencekaminlaw.com,aterry@lawrencekaminlaw.com,shennessey@lawrencekaminlaw.com

- **Thomas A. Dubbs**
  tdubbs@labaton.com,kgutierrez@labaton.com,1751297420@filings.docketbird.com,mpenrhyn@labaton.com,echan-lee@labaton.com,electroniccasefiling@labaton.com

- **Christopher J. Esbrook**
  christopher.esbrook@esbrooklaw.com,michael.kozlowski@esbrooklaw.com

- **Carol V Gilden**
  cgilden@cohenmilstein.com,lhoeksema@cohenmilstein.com,efilings@cohenmilstein.com

- **Thomas Gregory Hoffman , Jr**
  thoffman@labaton.com,kgutierrez@labaton.com,mpenrhyn@labaton.com,echan-lee@labaton.com,5560103420@filings.docketbird.com,electroniccasefiling@labaton.com

- **Matthew Langley**
  mlangley@rgrdlaw.com

- **Louis Carey Ludwig**
  lcludwig@pomlaw.com,kgutierrez@labaton.com

- **Silpa Maruri**
  silpamaruri@quinnemanuel.com

- **Francis P. Mcconville**
  fmcconville@labaton.com,kgutierrez@labaton.com,9849246420@filings.docketbird.com,electroniccasefiling@labaton.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,3045517420@filings.docketbird.com,e_file_sd@rgrdlaw.com

- **Frank Anthony Richter**
  frichter@rgrdlaw.com,lmix@rgrdlaw.com

- **Eric Robert Swibel**
  eric.swibel@lw.com,chicago-litigation-services-9637@ecf.pacerpro.com,chefiling@lw.com,eric-swibel-5392@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)